### DONALD MacRACKAN v. BANK OF COLUMBUS.

(Filed 26 November, 1913.)

**1. Usury—Definition—Interpretation of Statutes—Forfeitures.**

Usury is the taking of a greater premium for the use of money loaned than the law allows; and if the lender knowingly takes, receives, reserves, or charges a greater rate than 6 per cent per annum, he forfeits the interest if it has not been paid, and is subject to a penalty of twice this amount if the interest has been paid (Revisal, sec. 1951), and whatever the form of the transaction may be, it is usury if the rate of interest charged or received is unlawful.

**2. Usury—Intent Inferred.**

Whenever the usurious character of the transaction is revealed on the face of the instrument, the unlawful intent to charge or receive an illegal rate of interest for the money loaned will be inferred from the instrument itself.

**3. Usury—Banks and Banking—Loans to Officers—Interpretation of Statutes—In Pari Delicto.**

It is the receiving of a usurious rate of interest by the lender of money for which the statute, Revisal, sec. 1951, imposes the penalty, and the question is not affected by the fact that the loan is from a bank and made to a stockholder who is also a director of the bank and a member of its loan or discount committee; nor is the doctrine of *in pari delicto* applicable.

**4. Usury—Banks and Banking—Principal and Agent—Cashier—Imputed Knowledge.**

Notice to a cashier of a bank of an illegal charge of interest for money loaned by it, contrary to Revisal, sec. 1951, is notice to the bank, and the latter is fixed with notice of a transaction of this character when upon paying the usurious interest the borrower protests to its cashier against the excessive interest he is obliged to pay for the loan.

CLARK, C. J., files concurring opinion; ALLEN and BROWN, JJ., dissenting opinions.

APPEAL by defendant from *Ferguson, J.,* at June Special Term, 1913, of COLUMBUS.

This action was brought to recover the penalty under Revisal, sec. 1951, for knowingly charging and receiving from plaintiff a greater rate of interest than allowed by law, namely, 8 per cent interest on a note for $3,000.

MacRackan v. Bank.

The jury returned the following verdict:

1. Did the defendant knowingly take and receive from the plaintiff on the $3,000 note a greater rate of interest than 6 per cent per annum from 9 February, 1912? Answer: Yes.

2. If so, what amount of interest was paid on said note from 9th February to 30th May, 1912? Answer: $75.35.

3. What sum, if any, is the plaintiff entitled to recover? Answer: $150.70.

There was evidence that plaintiff was a member of the board of directors, one of the managing and loan committee of defendant bank; but he testified that, as such, he never passed on the loans of the bank, nor did he fix the rate of interest or help to do it. He also testified that he resigned about the time the loan in controversy was made, and that when he paid the unlawful interest he was not a member of the board of directors or the committee.

The following are the two instructions which defendant requested should be given to the jury:

1. "If the jury find from the evidence and by the greater weight thereof that at the time the note sued on in this action, to wit, on 9 November, 1911, and the time same was paid, to wit, on 30 May, 1912, the plaintiff was a stockholder and director in the Bank of Columbus, defendant in this action, and was at said time a member of the loan or finance committee, and as such passed on said note, and was at said time a member of the examining committee, the plaintiff would not be entitled to recover, even though they shall find that the plaintiff was charged and paid a greater rate of interest than 6 per cent."

2. "To entitle the plaintiff to recover in this action, the jury must find by the greater weight of the evidence, not only that the defendant charged and received more than 6 per cent interest from the plaintiff, but at the time same was charged and received the defendant knew it was usury, and there was in the mind of the lender a wrongful intent and purpose to take more than the lawful rate for the use of his money."

The first instruction was refused, and defendant excepted; the second was refused except as given in the charge, and defendant again excepted. Judgment for plaintiff, and defendant appealed.

MacRackan v. Bank.

*Jackson & Greer for plaintiff.*

*Irvin B. Tucker, W. H. Powell, and D. J. Lewis for defendant.*

WALKER, J., after stating the case: The defendant loaned to the plaintiff the sum of $3,000, and charged, reserved, and received from him, as interest thereon, a sum in excess of the legal rate. The character of the transaction is not involved in any doubt. Interest is the premium allowed by law for the use of money, while usury is the taking of more for its use than the law allows. It is an illegal profit. 4 Blk. Com., 156; *Yarborough v. Hughes,* 139 N. C., 200. If the lender knowingly takes, receives, reserves, or charges a greater rate than 6 per cent per annum, he forfeits the interest, and if the unlawful interest has been paid to him, he is liable to a penalty of twice the amount of interest so received. Revisal, sec. 1951.

The second prayer for instruction is directed to the intent with which the interest was paid. Where there is negotiation for a loan of money, and the borrower agrees to return the amount advanced at all events, it is a contract of lending, and however the transaction may be shaped or disguised, if a profit or return beyond the legal rate of interest is intended to be made out of the necessities or improvidence of the borrower, or otherwise, the contract is usurious. The corrupt intent mentioned in the books consists in the charging or receiving the excessive interest with the knowledge that it is prohibited by law, and the purpose to violate it. Our statute makes it usury if the interest is *knowingly* charged or received at the unlawful rate. When the illegal purpose stands clearly revealed on the face of the instrument, as in this case, no further inquiry into the intent is required. *Miller v. Insurance Co.,* 118 N. C., 612. The contract itself establishes the corrupt intent, as it is susceptible of no other meaning. These principles were settled in the recent case of *Riley v. Sears,* 154 N. C., 509.

This transaction cannot be explained upon any other theory than that the defendant knew the interest it exacted to be unlawful, and this makes it usury. *Doster v. English,* 152 N. C.,

339. The court charged the jury that knowledge of the illegal character of the interest received by the defendant was essential to its liability, when it gave this instruction: "If you find by the greater weight of the evidence that between 9 February, 1912, and 30 May, 1912, the plaintiff paid to the defendant bank a greater rate of interest than 6 per cent, and at the time the bank knowingly charged and received a greater rate than 6 per cent, then it is your duty to answer the first issue 'Yes.' If you do not so find by the greater weight of the evidence, you would answer it 'No.'"

The second question is, Did the fact that plaintiff was a member of the board of directors, and the managing and loan committee, purge the transaction of its usurious taint? The language of our statute (Revisal, sec. 1951) is positive and peremptory, and it was said (by *Justice Hoke*) in *Riley v. Sears, supra,* that the courts have enforced it strictly, and with insistence and alertness. It may be added by us now, that it is the declared policy of the State, which for many years has stood with the approval of the popular will, that usury shall not be exacted of the borrower, and "whenever, directly or indirectly, unlawful interest has been taken or charged, the provisions of the statute must be applied." *Riley v. Sears, supra,* and numerous cases therein cited. The only test is the taking of the excessive interest *knowingly,* and it can make no difference who is the borrower.

There is no exception in the statute of any person or class of persons. A bank is not privileged by the law to exact a larger rate of interest from its stockholders or officers than from those who are not.

This Court has uniformly held that a stockholder who has paid usurious interest to the corporation, of which he is a member, can recover the penalty, "notwithstanding that he is *in pari delicto* in the transaction. The statute (Code, sec. 3836; Revisal, 1951) expressly provides that a party who has so paid usurious interest (and is *in pari delicto*) may recover double the amount he has paid." *Hollowell v. B. and L. Assn.,* 120 N. C., 286. The same was held in *Rowland v. B. and L. Assn.,*

MACRACKAN v. BANK.

115 N. C., 825, where *Justice Burwell* says: "Thus, it appears that what it takes from one of its stockholders, under the pretense that it is lending at 6 per cent, it gives to another with a lavish hand. It is both a taker and a giver of usury."

The doctrine is familiar that where each is equally in fault (*in pari delicto*) the law favors him who is defending, or, as otherwise expressed, when the fault is mutual and of equal degree, the law will leave the case as it finds it. But the principle does not apply here. It is not, in law, a case of equal fault. *Lord Ellenborough* once said that where there is oppression on the one side and submission on the other, it never can be predicated as *par delictum,* for one holds the rod and the other bows to it. Broom's Legal Maxims (6 Am. Ed.), 695; *Smith v. Cuff,* 6 M. and S., 160. And in *Atkinson v. Denby,* 7 H. and N. (Exch.), 933, approving *Smith v. Cuff, supra,* and *Smith v. Bromley, infra,* Chief Justice. *Cockburn* said that where one of the parties is in a position to dictate and the other has no other alternative but to submit, it is virtually a state of coercion, and while the parties may be *in delicto,* it is not *par delictum*—they are not equally in fault, one being in a position of dependence on the other and having to submit to his terms or suffer if he does not, and that it would be mischievous if it were held that he could not recover the money paid under such circumstances.

*Lord Mansfield,* in the Court of King's Bench, while deciding the case of *Lowry v. Bourdieu* (2 Douglas, 469), reported in 99 Eng. Reports (Full Reprint, at pp. 209, 301), said, "he desired it might not be understood that the Court held that, in all cases where money has been paid on an illegal consideration, it cannot be recovered back. That in cases of oppression, when paid, for instance, to a creditor to induce him to sign a bankrupt's certificate, or upon a usurious contract, it may be recovered, for in such cases the parties are not *in pari delicto*."

The commentator on *Jones v. Barclay, infra* (99 Eng. Reports, Full Reprint, at p. 443, note F 7), says: "The inference to be drawn from the various decisions that have taken place on this subject, stated here and in the notes to *Lowry v. Bourdieu, supra,* 468, appear to be that, the general principle re-

maining, that *in pari delicto potior est conditio possidentis,* the two following exceptions to its application are also established: (1) That where the illegality exists in the contract itself, and that contract is not executed, there is a *locus penitentiæ,* the *delictum* is incomplete, and the contract may be rescinded by either party. (2) Where the law that creates the illegality in the transaction was designed for the coercion of one party and the protection of the other, or where the one party is the principal offender, and the other only criminal from a constrained acquiescence in such illegal conduct, in these cases there is no parity of *delictum* at all between the parties, and the party so protected by law, or so acting under compulsion, may at any time resort to the law for his remedy, though the illegal transaction be completed."

In another case (*Smith v. Bromley,* reported only in a note to *Jones v. Barclay,* 2 Douglas, 684, but in full from notes of *Justice Buller*), *Lord Mansfield* also said on this subject: "If the act is, in itself, immoral, or a violation of the general laws of public policy, there the party paying shall not have this action; for where both parties are equally criminal against such general laws, the rule is *potior est conditio defendentis.* But there are other laws which are calculated for the protection of the subject against oppression, extortion, deceit, etc. If such laws are violated and the defendant takes advantage of the plaintiff's condition or situation, there the plaintiff shall recover (citing cases in note); and it is astonishing that the reports do not distinguish between the violation of the one sort and the other." He then applies this principle, and says that the man who from mere necessity pays more than the other can in justice demand, and who is called in some books the slave of the lender, has the right to recover back what he has thus paid to his creditor, who has no right to retain it in violation of the law, and that the maxim, *Volunti non fit injuria,* does not apply. "It is absurd to say that one willingly transgresses a law made for his own benefit." In order to prevent this oppression and advantage taken of the debtor's necessity, as described by *Lord Mansfield,* our law makes it penal for the lender to take

more than it allows. And he concludes thus: "Upon the whole, I am persuaded that it is necessary, for the better support and maintenance of the law, to allow this action; for no man will venture to *take,* if he knows he is liable to *refund."*

The law upon which the judges were commenting in the last two cases was not as stringent and inflexible in its terms as our statute (Revisal, sec. 1951). What right have we to restrict the scope of the statute by construction, when its terms are perfectly clear and explicit, being broad and comprehensive enough to embrace every borrower who pays usurious interest and every lender who exacts or receives it? Every man who applies for a loan, in a very genuine sense, counsels that it be made. It would be strange if he should advise anything else. His own interest and present needs would dictate just such a course. Every borrower consents to the loan that is made to him, and often it is urged with extreme importunity. But the greater his necessity and extremity, the less excusable is the act of the lender in exacting usury. If the contention of defendant is upheld, the banks would be practically exempt from the forfeitures and penalties of the law, when they lend upon illegal interest to their officers and agents. Suppose the usurer lends to his agent, who has charge of his business, at the latter's request, shall he be allowed to keep the usury which he had no right to take? Our law intervenes and declares that not only the excess above the lawful rate may be recovered by the debtor, but "twice the amount paid," and, as we have said, without regard to the class or condition of the borrowers. They are all served alike. The only inquiry is, Was the money obtained extortionately? and if this be so, it has been uniformly decided that an action by the borrower will lie and the money recovered back.

In *Smith v. Cuff,* and other cases cited above, and many other cases that might be added to the list, the debtor had contracted with one of his creditors to give him a secret advantage over his other creditors in a general composition, and having paid the amount bargained for to the preferred creditor, it was held that he could recover it back, although he had made the bargain secretly, covinously, and for the purpose of de-

frauding the other creditors, who were ignorant of it, and for his own gain and advantage. The debtor recovers the money unlawfully paid, though the creditor, who combined with him to cheat his associates, could not recover on his bargain. *Wittkowsky v. Baruch,* 127 N. C., 313. That case is no stronger than this, for here there is no fraud, and the *statute* gives the action for the usury besides, and it would not only be contrary to the uniform current of decisions noted above, but also against the declared policy of the State, to hold that plaintiff cannot recover.

The defendant loaned this money with its eyes open, so to speak. There is competent evidence that it was its custom to lend it at the higher rate. It cannot shift the blame to the plaintiff because he was its director, when it knew the law, and was fully aware of its violation; nor can its stockholders safely or justly rely on any such excuse. The money, which belongs to the plaintiff, because the law says so, was received by it, placed in its vaults, and is there now, as far as appears. Neither the bank nor its board of directors, nor its body of stockholders, which has supreme control of its affairs, has ever offered to return the excess of interest, though they have all had full notice of its payment by the bringing of this suit, and before it was brought. If they did not authorize the same originally, that is, approve what had been done, they have subsequently ratified it, with knowledge of the facts, by not returning even the excess, but retaining it themselves, and this we know is equivalent to a prior authorization of it.

We doubt if there is any sufficient evidence that plaintiff participated in the meeting in which this loan was made; but that, in our view of the case, is immaterial. There is no place here for recrimination. The law assumes that the debtor is *in delicto,* and protects him against his own wrong, because of the inequality of the parties. And for this reason it is said that, in equity, "relief is granted against usurious contracts, whether executory or executed, since from considerations of public policy the two parties are not considered as standing on equal terms or *in pari delicto.*" Webb on Usury, sec. 342; 2 Pomeroy Eq.

Jur., sec. 937; *Peacock v. Terry,* 9 Ga., 137. His plea, there-fore, is not rejected because of his conduct in "advising" the loan to be made. "A contract by the borrower of money at an usurious rate of interest by which he agrees not to plead usury in defense to it does not estop him from doing so. Such a con-tract would, if sustained, furnish a ready mode of evading the usury laws." Webb on Usury, sec. 440. Whether this be a sound public policy or not, we are forbidden to inquire. We must abide by the written law. *Ita lex scripta est.*

We have nothing to do with the morality of the transaction nor the abstract merit of plaintiff's claim. We are judges of the law and not censors of his morals; but we say that it comes with poor grace from the defendant, who has openly violated the law, to blame the plaintiff for his part in the transaction. It would be inconsistent for the law to listen to such appeals, and condemn the plaintiff, when it has justified, if not encour-aged, what he has done.

In conclusion, let us say that the usury laws are an exception to the rule, *in pari delicto,* and in a case precisely like this one in its essential features, the Court has so held. In *Bank of Cadiz v. Slemmons,* 34 Ohio St., 142 (32 Am. Rep., 364), the Court said: "Recurring in this connection to the defense, it is clear that Thomas, the principal in the notes, was no more estopped from setting up the illegality (usury) by reason of his position as director, than if he had not been officially connected with the bank." Webb on Usury, sec. 518. The Court also held it to be clear, as matter of law, that none of the notes could bear interest, for the reason that their interest-bearing power was destroyed by the illegal agreement, and, therefore, pay-ments made generally could only apply to the principal, and this by the very terms of the statute, the policy of which no court will investigate. "It is the duty of the court to ascertain and declare the law, and not to indulge in speculations as to its policy or propriety, for such questions must be determined by those who make the law. The statutes upon the subject of usury have been long regarded as purely remedial and subject to the modification and control of the legislative department,

MacRackan *v.* Bank.

even as applied to past transactions." Webb on Usury, sec. 12.
And in *Ferguson.v. Sulphen,* 8 Ill., 547, it was said of this
question: "The law against usury is founded in principles of
public policy, principles that have been for ages recognized, and
almost universally adopted. Without inquiring into the policy
or justice of the statutes for the prevention of the usury, it is
the imperative duty of the judicial tribunals faithfully to exe-
cute them. If there is any injustice or impolicy in these enact-
ments, the fault rests with the Legislature and it must provide
the proper corrective, and not the courts. Whenever the injured
party invokes the aid of the courts, and presents a case clearly
within the statute, there should not be the least hesitation in
applying the appropriate remedy. The only effective mode of
discouraging and preventing the practice of usury is by a rigid
enforcement of the provisions of the statute. If a case comes
within the mischief of the statute, it should be held to be within
the remedy. And this seems to be the principle on which these
statutes have everywhere been construed and administered. The
real inquiry in every case is, whether there has been a borrow-
ing and lending at a greater rate of interest than the law allows;
and this becomes purely a question of fact, to be determined
from all the circumstances of the particular case. The defense
of usury is entitled to the same respect and consideration as
other defenses authorized to be made in the courts, and it is
the duty of the court to regard it the same as other defenses."

In defense of the law, if it needs any. from us, Chancellor
Kent, speaking of Jeremy Bentham's *dictum,* that he should
not wish to see the "spirit of project in any degree repressed,"
and commending the words of Lord Redesdale, that "the statute
of usury was founded on great principles of public policy," and
further quoting from him, said: "It (the statute) was in-
tended to protect distressed men, by facilitating the means of
procuring money on reasonable terms, and by refusing to men
who sit idle as high a rate of interest, without hazard, as those
can procure who employ money in hazardous undertakings of
trade and manufacture. I trust that theoretic reformers have
not yet attained, on this subject, any decided victory over pub-
lic opinion. The statute of usury is constantly interposing its

warning voice between the creditor and the debtor, even in their most secret and dangerous negòtiations, and teaches a lesson of moderation to the one, and offers its protecting arm to the other. I am not willing to withdraw such a sentinel. I have been called to witness, in the course of my official life, too many victims to the weakness and to the inflamed passions of men," and he expressed the wish that "the first experiments of Bentham's projects may not be made within these walls." *Dunham v. Gould,* 16 Johns. (N. Y.), 367.

The plaintiff, at the time he paid the interest, complained to the cashier that it was excessive, and was told that it was the usual rate. The bank insisted on the usury to the last, and even to this time. If the borrower could not waive his right to take advantage of the usury by a prior express agreement to do so, which we have seen he cannot do, why should any kind of previous consent affect his right when it was given?

There are four constituent elements in a usurious contract:

1. A loan or forbearance of money, either express or implied.

2. An understanding between the parties that the principal shall be or may be returned.

·3. That for such loan or forbearance a greater profit than is authorized by law shall be paid or agreed to be paid.

4. That the contract is entered into with an intention to violate the law.

The fourth element may be implied if all the others are expressed upon the face of the contract, or are established by a sufficiency of evidence. Webb on Usury, sec. 18. All of them have been shown in this case, plainly and clearly, and we conclude that there is no reason why the plaintiff is not entitled to the benefit of the statute, without regard to the moral guilt, or his conduct in asking for it, whether it be good or bad. That the law favors the plea is sufficient; and while it does not become the usurer to question either the wisdom, policy, or justice of the law, it may be said that he is not expected to have a very good opinion of it. It is for this reason that the penalty is given to restrain his cupidity and to punish his defiance of it, and also to deter him from a repetition of the offense. There

is no exception in the statute of those who are induced to take usury, even against their will. It is the bare taking of it that is condemned by the law and penalized. No amount of persuasion, or even importunity, by the borrower, will justify the forbidden act of the usurer. He is subjected to the penalty for what *he* does, and cannot call to his aid the conduct of his debtor for his acquittal. The rule may appear to be harsh in some instances, but it must operate uniformly in order to execute the legislative will, so plainly declared.

Appellant suggests that plaintiff, as one of its officers, was a trustee, and therefore, that advising it to take usury was a breach of trust, for which he is liable in damages to the stockholders. We doubt the correctness of the abstract proposition thus stated, but it does not apply to this case. He denies squarely that he advised it, and the cashier's testimony is not inconsistent with his. The cashier does not say that he advised the taking of 8 per cent in this case, but only that he generally advised it, but they did not always follow his advice. The bank knew that it was charging usury. It was not an incompetent nor an imbecile, and did not have to be told by him what was the legal rate. It will hardly be urged that it did not know the legal rate.

The fiduciary relation, if it existed, counts for nothing, if the *cestui que trust*—the bank and its stockholders—knew of and consented to the loan, as was done in this case. It will not be asserted that the latter could recover any damages under such circumstances. The case of *Townsend v. Williams,* 117 N. C., 336, does not apply. The director here was not dealing with a third party, as in that case, but the bank was dealing with him as its borrower. "Note the diversity." Besides, even if plaintiff has looted the bank, the latter is the beneficiary of the loot, which it now holds and refuses to return. After plaintiff had resigned and he and the bank were at arm's length, so to speak, he having divested himself of all fiduciary relation to it, he complained to the cashier of the excessive interest, when he paid the money, simply as a borrower of the bank, and the bank, by its cashier, even then insisted upon the usury. Notice to the

cashier was notice to the bank and its stockholders, for he was vested with plenary authority, and he took the excessive interest for the bank "with his eyes open" and after being warned not to exact it. The bank has since ratified what he did, if ratification was needed to bind it by his act.

*Gund v. Ballard,* 73 Neb., 547, has no application. It was a suit in equity for a settlement of the affairs of a corporation, and as plaintiff was asking equity, the court merely required him to do equity and take the legal interest, and the whole controversy was about that matter, except so far as it was mixed with the actual fraud of the plaintiff. But that is not this case at all. This is a suit at law, unmixed with any equity, to recover a statutory penalty, and we are compelled to obey the mandate of the statute, regardless of our personal views of its morality. There is no equitable principle involved, and this Court has so ruled in the cases we have cited, which have allowed officers to recover. If, however, the *Gund case* were in point, we should follow our own decisions, which construe our own statutes, especially as they are sustained by decisions in other jurisdictions. If anything is settled by the books, it is that the maxim, *in pari delicto,* does not apply to usury cases. If a borrower's promise to waive usury, which itself induced the loan, is not binding, how can there be any waiver in the case?

The "blood-letting" statute may have been obscure, though we do not think it was, and the Court properly construed it, but it is a "far cry" from this statute to that one, for the Legislature has made its meaning perfectly clear, and there can be no reasonable doubt that the law denounces all loans upon usury indiscriminately and annexes the forfeiture and the penalty. It makes no distinction among borrowers—they are all under its care and protection. The phlebotomy case and this one are, therefore, wide apart in time and tenor, the only similitude being that the sufferer is bled in both cases, but here the analogy ceases, and the bank cannot assume the rôle of the good physician, as its own act was not one of benevolence.

There is no danger of breaking a bank by insisting upon obedience to the plain mandate of the statute. Lending to its

officers upon usury is no more dangerous to it than lending to other persons. If one course will deplete its funds and empty its vaults, the other just as surely will do the same thing. No argument, therefore, can be drawn from this classification of borrowers which can militate against the strict execution of the legislative will, as unmistakably written in the statute, Revisal, sec. 1951, and as interpreted by this Court in numerous cases. The stockholders are not parties to this suit, they seek no relief, and the bank has set up no counterclaim, either for itself or in their behalf. If this were a matter of mere sentiment, and not the construction of a positive statute, we might question the propriety of plaintiff's course; but not being so, we must abide by the Legislature's declaration of its policy. The bank, though, is in no position to criticise the plaintiff's conduct, as it has broken the law and still holds his money, received in open violation of it.

In *Thomas v. Fish,* 9 Paige (N. Y.), 478, 482, a case much stronger for the defendant than is this, it was held that the actual fraud of the borrower in palming off a false security upon the lender will not defeat the plea of usury in an action by the latter to recover the debt, as the statute is peremptory in its terms and admits of no such exception. The statute, construed in that case, is like ours. The law encourages the plea to prevent the wrong or its repetition, and to enforce its policy, which is based upon the ancient proverb that "the borrower is servant to the lender," and it seeks, therefore, to protect the latter against injustice and oppression.

The Court in *Miles v. Kelly,* 25 S. W., 724, said that, under the statute, the debtor cannot waive or contract away his right to the defense of usury, nor can he be estopped to insist upon it. To the same effect is *Bank v. Smyth,* 30 S. W., 678, where the debtor attempted to do so by express contract. The Court held that it was directly opposed to the policy of the law to allow it and thereby defeat its beneficent purpose. When rightly considered, the authorities are all one way. At this term we have held, in *Cooke v. Cooke, post,* 272, construing the ten years divorce provision of the statute, that as no exception is made against

the right of either party to bring the suit, the Court could not hold that it can lie only in favor of the party injured. *Justice Hoke* (the *Chief Justice* and *Justice Brown* concurring) says: "There is no such exception, and the courts are not at liberty to add to the statute what the Legislature has not seen fit to provide." And again: "As no exception is made in favor of the injured party, nor to exclude the time covered by the divorce *a mensa,* we must administer the law as we find it, and if it proves to be unwise in policy or undesirable in results, it must be changed by the legislative department, which has exclusive cognizance of the subject." This is really an apt and close analogy, and, in principle, there is absolutely no difference or distinction between the two cases. The one inevitably rules the other. There was a dissenting opinion in the case, but upon the ground, solely, that the statute had expressly provided that the suit should be brought by the injured party only.

In ascertaining the legislative will, we are warned against what is known as the predestined interpretation of statutes, which takes place when, laboring under a strong bias of mind, induced even by a sense of justice, we unconsciously make the text subservient to our preconceived views or desires, which accord, it is true, with our individual notion of what is abstractly right. This, we are told, is making the law, and not even interpreting or construing it, which itself is not permissible, when it is plainly written and carries but one meaning. There is then no room for reasoning or construction. We merely declare it to be what in reality it is.

After a careful review of the record, we conclude that the ruling of the court was correct.

No error.

CLARK, C. J., concurring: I concur fully in all that is said in the admirable opinion by *Mr. Justice Walker* in this case. It leaves nothing to be added. Upon the defendant's own showing, it has been continuously for years an open and defiant violator of the law; yet it is now asking the Court as a special favor to write into the statute an exemption in its favor. The

MacRackan *v.* Bank.

Court has no power to do so, and if it had the discretion, the defendant is not in a position to ask the mercy of the Court. Besides, the plaintiff has his rights, given him by statute.

It is astonishing that those who are indebted for the protection of their property and their business entirely to the respect which the people shall show to the law should thus inculcate by their daily conduct contempt for the law. The law against usury is as much the law of the State, and to be respected as such, as the law against burglary and larceny. Upon what ground can the defendant expect its property to be protected against such offenses when it is setting an example daily to the public of the violation of law for the purpose of taking the property of others illegally? It can matter little when the property of others is taken contrary to law, whether it is done by the use of a crowbar or by imposing upon the necessities of the needy, in a manner forbidden by statute.

The defendant has had the favor of incorporation, whereby the property of its stockholders and officers is exempt from liability for its debts, except to a limited extent. The bank and its officers have had the protection of the law in safeguarding their property and their persons. Yet, in total disregard of these matters, they have been for years admittedly open and notorious and hardened offenders against the laws of the State.

It is no defense, even if it were shown, that the plaintiff formerly aided the officers of the bank in their illegal conduct. They had no right on that account to victimize him any more than to impose illegally upon any one else. The question presented is not the former conduct of the plaintiff, but their conduct towards him in this transaction. If he had agreed (which he denies) to their exaction of usury in his case, the same is true as to the victim in every case of usury. The law provides that such acquiescence by any borrower shall not only be no estoppel, but that he shall have the right to "recover back twice the amount of interest paid." The plaintiff is entitled to this protection of the law which is given to every other citizen.

There is nothing more dangerous for property holders than to inculcate contempt of law by themselves disregarding it.

They owe the protection of themselves and their property to the respect which is paid by the community to the law and its enforcement.

*Townsend v. Williams,* 117 N. C., 336, is authority for the proposition that directors must direct, and if loss comes to the company by reason of their misconduct or negligence, they are liable both to stockholders and to creditors. If the directors of this bank, including this plaintiff, by their violation of law subjected the bank to suits for the recovery of double the interest in cases of usury, the stockholders, and if necessary the creditors, are entitled to recover for the losses so inflicted. This is wholesome doctrine, and should be oftener applied. But it has no application in this case, where the plaintiff was the borrower and could not be also acting as a director. In fact, he testifies that he did not assent to the usury charged against him. But if he did, the law forbids it to be held a legal assent. As to this transaction, he stands simply on the same footing as any other borrower. The law gives him the same remedy of recovering double the interest paid that it gives to any other borrower. The stockholders, of course, can recover against the other directors for the loss thus sustained by their conduct.

Allen, J., dissenting: The plaintiff ought not to recover upon the facts in this record, unless the law is clear and unmistakable in his favor, and then only in obedience to the mandate of the law, which must be the final arbiter for the judge in his efforts to attain justice.

The plaintiff is an attorney at law, who drew the charter of the defendant bank, and while he denies that he was the general counsel of the bank, he admits that he has now an uncollected claim against it for legal services, which he says were rendered during the time of the transactions complained of. He was at all times a director of the bank, a member of its finance committee, a member of its loan committee, and a member of its examining committee.

He testified, among other things: "I was a stockholder in the bank at the time, and was a director at the time the note was given. I cannot say whether or not I was at the time it

was paid. I resigned about that time. I cannot say that I passed on the loans as director. I applied for the loan and obtained it. I was either a member of the loan committee or the finance committee; I cannot say which. They are not the same thing. I did not pass on the loans of the bank or fix the rate of interest or help to do it. I was on the examining committee. I had been director from the time the bank was organized. I was not general attorney for the bank. I have the bank sued for some special services rendered. I drew the charter when the bank was organized. I was director of the bank at the time I borrowed this money and at the time I paid it back, and also a member of the loan and examining and a member of the finance committees."

The cashier of the bank also testified: "Mr. MacRackan advised the board of directors to charge 8 per cent all the time. That was always his advice, but we did not charge 8 per cent all the time."

And upon these admitted facts and upon the evidence, his Honor, in an action by the plaintiff to recover the penalty for charging and receiving usurious interest—double the amount of the interest paid—has excluded from the consideration of the jury everything except the amount of interest paid, and has charged the jury to answer the issue in favor of the plaintiff if the rate of interest was greater than 6 per cent.

He also refused to give the special instruction prayed for by the defendant.

In my opinion, there was error in the charge given and in refusing the one requested.

The plaintiff was a director, and as such, clothed with a trust in behalf of the corporation, stockholders and creditors, and he had no legal or moral right to divest himself of the trust and assume a hostile relation.

The directors elect the officers; their acts are corporate acts; they control and manage the property of the bank, and say to whom money shall be loaned and upon what terms. Invested with these powers, and recognizing that the money of depositors and stockholders cannot be safeguarded unless officers are diligent and honest, the law imposes corresponding duties.

"The high degree of confidence and responsibility resting upon directors of corporations has often led the courts to regard them as trustees, and to declare the relationship existing between them and the stockholders to be that of trustees and *cestuis que trustent,* respectively. If this can be asserted with regard to the generality of corporations, it is peculiarly and exceptionally true with regard to banking corporations, in whose solvency the whole neighboring community must be at least indirectly interested. A bank of issue may properly be regarded as a *quasi*-public corporation. The directors of a bank are not trustees for the stockholders alone, but they owe an even earlier duty to the depositors, and if the bank exercises the privilege of circulation, still a prior duty to the public at large. The law is, as it ought to be, very jealous in exacting the strict and thorough performance of these duties, and it is in the scrutiny of possible breaches of them that the rigid rules which govern trustees have been applied. It is not enough to exculpate a director, that no actual dishonesty can be shown, that he cannot be positively proved to have been influenced by interested motives. Like a trustee, he is absolutely prohibited from the performance of those questionable acts wherein his conduct may be wholly free from blame, but where the bias of self-interest is strong, and may influence him even without his own recognition of the fact. A director, who wishes to keep completely within the protection of the law, must look to something more than the mere integrity of his own intentions." Morse on Banking, sec. 125.

This principle has been declared and enforced in this Court. In *Townsend v. Williams,* 117 N. C., 336, the present *Chief Justice,* quoting from *Shea v. Mabry,* 1 Lea, 319, said: "Directors are not mere figureheads of a corporation. They are trustees for the company, for the stockholders, for the creditors, and for the State. They must not only use good faith, but also care, attention, and circumspection in the affairs of the corporation, and particularly in the safe keeping and disbursement of the funds committed to their custody and control. They must see that these funds are appropriated as intended for the

purposes of the trust, and if they misappropriate them or allow others to divert them·from those purposes, they must answer for it to their *cestui que trust.*"

Applying this doctrine to the facts, the plaintiff was a trustee, and the defendant bank, its stockholders, and depositors, were his *cestui que trust.*

The purpose of the trust was to make legal contracts, not illegal ones; and if he allowed the funds of the bank to be diverted from this purpose, he became·liable to his *cestui que trust.*

Suppose as director he had approved a loan to a stranger at an illegal rate of interest, and the stranger had paid and then recovered the penalty, can it be doubted that the stockholders and depositors could have compelled him to make good the loss? If so, his position cannot be stronger because the penalty is in his own pocket instead of in the pocket of a stranger; and if he could be made to refund, the law will not permit him to recover.

In *Gund v. Ballard,* 73 Neb., 548, the Court so declared. "The president and director of a bank cannot enter into a contract with the corporation in which he is such an officer to pay an usurious rate of interest on money owing by him to such corporation, and thereby escape the payment of all interest on such indebtedness under the statute denouncing usurious contracts. The law will not permit him, acting in the dual capacity in which he was, and in a sense the agent of his principal, the bank, to enter into a usurious contract with himself and his principal, and thereby escape all liability for the payment of interest on the principal sum of the indebtedness for which he thus became obligated. It must be accepted, we think, as fundamentally correct that he could not be permitted to profit by his own wrongful action, nor by the action of the bank on the one part and himself on the other, to the prejudice of the stockholders, he holding, as he did, the fiduciary relations then existing between him and the corporation and those it represented."

There is another reason for denying a recovery to the plaintiff, if we have regard to the spirit of the statute, "which giveth life," instead of to its letter, "which killeth."

The lender and borrower in a usurious transaction are parties to an illegal contract, and the general rule is that the courts will not aid either party to such a contract. An exception is, however, made in favor of the borrower, but on the distinct ground that as he is under the control of the lender, "in chains," as expressed in the brief of appellee, his payment is not voluntary, and that while *in delicto,* he is not *in pari delicto.*

How is it with the plaintiff? He drew the charter of the bank and aided in its organization.· It was the child of his own loins, and as attorney, director, member of the finance committee, member of the loan committee, and member of the examining committee, he had the authority and control of a parent.

Why, then, should we give him relief, unless we return to the days when it was seriously contended that a statute against "letting blood on the streets" embraced a surgeon who bled his patient to save his life?

I not only think the opinion of the Court wrong, but it appears to me to establish a policy which will weaken confidence in banks, and will furnish opportunity to officers to deplete the funds of the bank, with impunity, at the expense of innocent stockholders and creditors.

If one director can borrow at a usurious rate, and after payment, recover the penalty, so can all. If they can borrow a small amount, they can borrow the capital of the bank, and the larger the rate of interest they charge each other, the greater will be the recovery when they sue for the penalty.

Brown, J., dissenting: In the language of the *Chief Justice,* "I concur fully in all that is said in the admirable opinion" by *Mr. Justice Allen* "in this case. It leaves nothing to be added."

Upon the plaintiff's own showing he, as a director and one of the controlling officers of the defendant bank, in the language of the *Chief Justice,* "has been continuously for years an open and defiant violator of the law," yet he is now asking the Court to set a premium on his misconduct, to reward him for his misdeeds, and to visit its wrath upon all the other directors except himself.

He admits that he was a director and financial officer of the defendant when he borrowed the money. He participated in the loan to himself, and practically admits that he advised and directed the cashier to charge 8 per cent on all loans.

The first prayer for instruction requested by the defendant and refused by the court, in my opinion, embodies both sound law and good morals. There was abundant evidence to support it.

If the jury should find that the plaintiff was a director in the defendant bank and a member of its finance committee, and passed on and authorized the loan to himself at a usurious rate of interest, he ought not either in law or good morals to be permitted to recover the fruits of his own wrong, and subject the innocent stockholders to loss who had trusted him to conduct their institution honestly and according to the law of the land.

It is said in the concurring opinion in this case that "they (the directors) of this bank have been for years admittedly open, notorious, and hardened offenders against the laws of the State."

One of these "hardened offenders" so severely castigated is the plaintiff, whom the majority of this Court think should be allowed to recover from innocent stockholders the penalties which are intended only for innocent and oppressed debtors.

A bank is not a human being, and cannot act for itself. It is a creation of law, an artificial person, and must act through its officers. If they are unfaithful and violate the law, the innocent stockholders suffer.

It is said "that if the directors by violating the usury law subject the bank to suits for the recovery of the penalties imposed by the statute, the stockholders and, if necessary, the creditors are entitled to recover for losses so inflicted," and that "this is a wholesome doctrine and should be oftener applied." I fully concur in that sound and just principle.

That is exactly what the minority of this Court believe should be done in this case. There is no better opportunity to apply this salutary principle than now. By his own conduct, as a director, in voting to loan money to himself at a usurious rate of interest, the plaintiff has subjected the bank and its innocent stockholders to loss.

To hold that the officer and director, who has brought about this loss, can recover the penalties imposed by the statute, as a reward for his own misconduct, and be exonerated also from all future liability for his wrongful act, is in my opinion a legal solecism, and in contravention of a sound public policy.

It is useless to say, as is said in the concurring opinion, that the plaintiff denies these charges, although there is strong evidence offered by the defendant to sustain them, for, in refusing the plaintiff's instruction, the court declined to allow the jury to pass upon the matter.

I am of opinion that upon the admitted facts and uncontradicted evidence in this case the plaintiff is entitled to have all excessive interest eliminated from his debt to defendant, but that, inasmuch as a director he consented to the loan to himself at a usurious rate, he is at least *in pari delicto,* and is not entitled to recover penalties which the defendant must suffer because of the plaintiff's own wrongdoing.

It is an almost universal axiom of the law that no man shall enjoy the fruits of his own wrong.