WESTERN AUTO SUPPLY COMPANY v. JAMES OLIVER VICK, TRADING AND DOING BUSINESS AS A WESTERN AUTO ASSOCIATE STORE

No. 11

(Filed 5 May 1981)

1. Usury § 1— elements

In N. C. the elements of usury are a loan or forbearance of money, an understanding that the money loaned shall be returned, payment or an agreement to pay a rate of interest greater than that allowed by law, and a corrupt intent to take a greater return than that allowed by law for the use of money loaned.

2. Usury § 1.2—forbearance defined

For the purpose of applying the law of usury to a given transaction in order to determine its applicability, the term "forbearance" means the contractual obligation of a lender or creditor to refrain for a given period of time from requiring the borrower or debtor to repay the loan or debt which is then due and payable.

3. Usury § 1.2— transaction constituting loan

It is the established law of N. C. that if the purchaser of a note requires the endorsement of the seller as guaranty of payment, as between the immediate parties thereto, the transaction is, in effect, a loan.

4. Usury § 1.2— purchase of inventory for Western Auto Store—assignment of chattel paper to plaintiff—transaction as forbearance

The Court of Appeals properly held that the transactions between the parties amounted to a forbearance of money upon an understanding that credit so extended by the forbearance would be repaid where the evidence tended to show that, under the terms of his franchise as a Western Auto dealer, defendant was entitled to make wholesale purchases from plaintiff on open credit accounts; the accounts could be collected on ten days notice to defendant; at all times, defendant had the option of paying for the amount due either in cash or

by transferring to plaintiff the chattel paper which had been generated by the sale of the merchandise which he had received; though, in effect, defendant had assigned the installments which were due to plaintiff, he remained liable for collecting the amounts due from the individual installment debtors and forwarding the collections to plaintiff; whether or not the individuals made the appropriate payments to defendant, he remained obligated to pay the installments as they became due; in the event that a particular account became more than ninety days in arrears, defendant was required to repurchase the chattel paper from plaintiff even though the payments on the account might have been current; to the extent that defendant remained ultimately responsible for the payment of the principal amounts due on the accounts assigned to plaintiff, plaintiff engaged in the forbearance of defendant's debt by refraining from collecting amounts due from defendant directly until such time as it became satisfied that the chattel paper transferred would not otherwise be paid off; and it was apparent that both parties to the arrangement contemplated that defendant's obligation to repay the credit extended was absolute in the event that the chattel paper was not paid out by the consumers who had executed it.

5. **Usury § 1.3— amount of interest—amount financed determined on transaction by transaction basis**

Where defendant purchased the assets of a Western Auto Store and, under the terms of his franchise, was entitled to make wholesale purchases from plaintiff on open credit accounts, the accounts could be collected on ten days notice to defendant, and defendant, at all times, had the option of paying for the amount due either in cash or by transferring to plaintiff the chattel paper which had been generated by the sale of the merchandise which he had received, the Court of Appeals was correct in viewing the transactions between the parties as separate and distinct occurrences for purpose of applying the usury laws; and where the parties stipulated that none of the transfers involved more than $50,000, the nine percent per annum interest limitation provided by G.S. 24-1.1(3) applied to the present action.

6. **Usury § 1— corrupt intent—sufficiency of evidence**

The corrupt intent required to show usury is merely the intention to take the interest which is called for in the loan or forbearance agreement, and in the event that the agreed upon interest exceeds that allowed by law under the particular circumstances of the case, the requisite usurious intent exists. The record in the present case established this intention on the part of plaintiff where the parties' purchase agreement called for the letters of transmittal to be structured so that defendant would deduct from the total amount due under each agreement submitted for acceptance the portion of the finance charges due under the contract which were to be retained by plaintiff when the sums due under the agreement were collected and forwarded to it; the amount of the deduction so made varied depending upon the length of the contract transferred; and in any event, the deduction was never less than 65% of the finance charge, nor was it ever more than 70% of the finance charge.

7. **Usury § 1— usurious transactions—no time-price sales**

Transactions between the parties which defendant claimed were usurious did not fall within the time-price exception to the usury statutes since the

Auto Supply v. Vick

transactions complained of were not bona fide sales, and the transactions did not embody a price differential which was fixed at the time of the sale.

Justice MEYER dissenting.

Justices EXUM and CARLTON join in this dissenting opinion.

Justice CARLTON dissenting.

Justice MEYER joins in this dissenting opinion.

ON discretionary review of the decision of the North Carolina Court of Appeals reported at 47 N.C. App. 701, 268 S.E. 2d 842 (1980), reversing the judgment of *Browning, J.,* entered at the 11 June 1979 Civil Session of NASH Superior Court.

Plaintiff is a Delaware corporation registered to do business in North Carolina. It engages primarily in the sale of merchandise at wholesale to owners of Western Auto Associate Stores. Defendant was a field service supervisor for plaintiff for three years before going into business for himself as the owner of a Western Auto Associate Store in Rocky Mount, North Carolina.

On or about 17 August 1971, plaintiff and defendant entered into an agreement whereby defendant was to purchase the assets of a Western Auto Store in Rocky Mount which plaintiff had previously operated for its own account. Upon purchase of the business by defendant, the operation became an associate store. Under the associate store concept, defendant owned and operated his store independently of any control by plaintiff. As the owner of an associate store, defendant was entitled to sell private brands of merchandise he had purchased from plaintiff. In addition, defendant had the right to invoke the goodwill which plaintiff had established in the operation of the store for its own account by holding out his business as a Western Auto Associate Store or as a Western Auto dealer.

In connection with the transaction, the parties executed three documents: (1) a contract governing the terms of the franchise; (2) a "purchase agreement" regulating the assignment of conditional sales contracts by defendant to plaintiff and the respective liabilities of the parties concerning such a transaction; and (3) a security agreement granting plaintiff a security interest in much of defendant's then-owned and after-acquired business property.

In connection with the acquisition of the assets of the store, defendant also purchased chattel paper which had been generated by the operation of the business as a company-owned enterprise. At the time of the transaction, the total outstanding balance attributable to the chattel paper amounted to approximately $175,000. Under the terms of the "purchase agreement", defendant became legally responsible for the amounts due under the paper so transferred.

At the time that defendant began operating the store, he was furnished a supply of retail installment sales forms. These forms were to be utilized by defendant in documenting any retail sale of merchandise which involved a time payment arrangement. Defendant was also furnished a supply of transmittal forms which were to be employed in transferring the executed retail installment sales agreements for credit on his account. It was upon such transactions that defendant's counterclaim hereinafter referred to was founded.

Under the associated stores plan, four types of credit accounts were available to the owner of a local operation: (1) a "regular account" to which customary or regular purchases of merchandise and other supplies would be charged; (2) a "trade acceptance" account to which purchases of merchandise (usually seasonal in nature) would be charged for which payment was to be made at a subsequent designated date; (3) a "dating terms" account tc which purchases of specially offered merchandise would be charged for which payment would be made at a later date (ususally a shorter time period than that allowed by the trade acceptance account); and (4) a "floor plan" account to which purchases of larger items of merchandise would be charged for which payment would be made in six consecutive monthly installments after the delivery of goods.

Pursuant to the terms of a memorandum dated 29 December 1972, as to charges made to defendant's regular account, payment would be due not later than the tenth day of the month for charges reflected in the account statement issued by plaintiff around the first of the month, and payment would be due not later than the twenty-fifth day of the month for charges reflected on the account statements provided by the plaintiff at mid-month.

The charges which were made to defendant's regular account, as well as those to the other three accounts in some instances, were satisfied by either making cash payments to plaintiff or by submitting to plaintiff chattel paper which had been generated by the continued operation of the Rocky Mount store. When such transfers were made, the chattel paper was accompanied by a letter of transmittal. That document would identify the agreements so transferred by the name of the purchaser involved and the contract number of the agreement. In addition, the letter indicated the amount due under each agreement, as well as the applicable finance charge. The initial purchase agreement required defendant to compute the amount of credit that he was requesting under each letter of transmittal. The required computation called for defendant to deduct an appropriate portion of the finance charge from the total amount due under each contract which was being submitted for credit. On a contract of eighteen months or less, the deduction amounted to 65% of the finance charge. On a contract of between nineteen and thirty-six months, the deduction amounted to 70% of the finance charge. These deductions represented the portion of the finance charge which plaintiff was to retain for itself when the sums due under the chattel paper were collected in full. None of the transfers of chattel paper involved an amount equal to or greater than $50,000. Defendant never received any money from plaintiff in connection with such transfers.

After submission of the documents to plaintiff, one copy of the transmittal letter would be returned to defendant bearing a notation on it by plaintiff as to the amount of credit that was being extended pursuant to the particular transaction. The amount of the credit so provided would be reflected on the next statement of account which would be issued by plaintiff to defendant.

These statements of account were furnished periodically to defendant by plaintiff. Initially, the statements were furnished as often as weekly, but commencing in January 1977, they began to be issued on a semi-monthly basis. Each statement of account would detail the charges that had been made to each of defendant's accounts. Appropriate credits would also be outlined on the statements. Furthermore, in regard to the chattel paper that had been transferred to plaintiff by defendant, plaintiff would submit an installment billing for the aggregate amount due during the

month on the chattel paper. If there was any shortfall between the total amount due at that time on the assigned accounts and the amount that the debtors had actually paid to defendant, he was required to remit the difference to plaintiff. This responsibility was reinforced by the obligation on the part of defendant to collect all payments which were due on the chattel paper, to send out any delinquency notices that were required, and to repossess any merchandise if the monthly payments were not forthcoming. Periodically, auditors would be dispatched by plaintiff to examine the ledger cards which defendant was to maintain on each account. If the examiners found any account to be more than ninety days in arrears, defendant was required to pay to plaintiff the entire balance then due on the particular account so identified. This repurchase obligation was imposed notwithstanding the fact that the monthly payments on such accounts made by defendant would be current. Upon such a repurchase, the chattel paper would be returned to defendant.

In early 1976, plaintiff filed suit against defendant, alleging, *inter alia*, that defendant had defaulted on his obligations under the purchase agreement; that plaintiff had demanded that defendant repurchase for cash all of the chattel paper which had been transferred to it; and that defendant had failed and refused to repurchase the chattel paper in question. According to the complaint, the total amount of the obligation owed by defendant to plaintiff was in excess of $398,000. Defendant answered, denying the allegations of the complaint. He also counterclaimed for damages, contending that plaintiff had wrongfully sold defendant's inventory, equipment, fixtures, accounts receivable, and chattel paper; that such sale was not in a commercially reasonable manner; and that the transfers of chattel paper were subject to the usury laws of North Carolina.

By consent of the parties, defendant's counterclaim for usury was ordered severed from the remainder of the action and tried without a jury. Upon trial of the counterclaim, the trial court denied plaintiff's motion for an involuntary dismissal pursuant to G.S. § 1A-1, Rule 41(b)(1969); however, the court entered judgment on the counterclaim in favor of plaintiff. The judgment was certified for immediate appellate review under G.S. § 1A-1, Rule 54(b)(1969).

Defendant appealed from the entry of judgment in favor of plaintiff. Plaintiff cross-appealed from the trial court's denial of its motion to dismiss. The Court of Appeals, in an opinion by Judge Wells, concurred in by Judges Webb and Martin (Harry C.), affirmed the trial court's denial of the motion to dismiss, but it reversed the entry of judgment in favor of plaintiff. On 4 November 1980, we allowed plaintiff's petition for discretionary review of the decision of the Court of Appeals pursuant to G.S. § 7A-31 (1969).

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, by Michael E. Weddington and Carl N. Patterson, Jr., for plaintiff.*

*Biggs, Meadows, Etheridge & Johnson, by M. Alexander Biggs and Samuel W. Johnson, for defendant.*

*Berry, Bledsoe, Hogewood & Edwards, P.A., by Harry A. Berry, Jr., Dean Gibson and Gary D. Chamblee, for the North Carolina Consumer Finance Association, Inc., amicus curiae.*

*A. Thomas Small for First Union National Bank of North Carolina, amicus curiae.*

BRITT, Justice.

The Court of Appeals held that the transactions between the parties which gave rise to defendant's counterclaim involved the payment of interest in return for the forbearance of money owed on account. Accordingly, the court concluded that the North Carolina usury statutes governed the conduct of the parties in the transfer of the chattel paper under the purchase agreement. In particular, the Court of Appeals directed its attention to two of the findings of fact which had been made by the trial court and excepted to by defendant. The challenged findings are:

10. Without regard to whether payment for merchandise purchased by Vick from Western Auto and reflected on a 'statement of account' rendered by Western Auto to Vick was made in cash or with chattel paper, the amounts for which Vick was given cash or chattel paper—equivalent credit upon his account(s) were no longer deemed by Western Auto or Vick to be owed by Vick to Western Auto for the merchandise purchases by Vick reflected in his account(s).

* * *

16. From the written agreements entered into between Western Auto and Vick and their course of dealing thereunder, which was not inconsistent therewith, it is clear that Western Auto and Vick intended and viewed the transactions between them as the purchase and sale of merchandise and the purchase and sale of chattel paper.

While the findings of fact entered by a trial court are conclusive on appeal if they are supported by any competent evidence, even though there may be evidence in the record to support contrary findings, *e.g., Henderson County v. Osteen,* 297 N.C. 113, 254 S.E. 2d 160 (1979), if there is no evidence in the record to support the findings to which proper exceptions have been entered, such findings must be set aside. *Textile Insurance Co. v. Lambeth,* 250 N.C. 1, 108 S.E. 2d 36 (1959). The Court of Appeals concluded that these findings are unsupported by any competent evidence and with that conclusion and the decision favorable to defendant we agree.

*I.*

[1] It is well-established in North Carolina that the elements of usury are a loan or forbearance of money, an understanding that the money loaned shall be returned, payment or an agreement to pay a rate of interest greater than that allowed by law, and a corrupt intent to take a greater return than that allowed by law for the use of money loaned. *Kessing v. National Mortgage Corp.,* 278 N.C. 523, 180 S.E. 2d 823 (1971); *Henderson v. Security Mortgage and Finance Co.,* 273 N.C. 253, 160 S.E. 2d 39 (1968); *Preyer v. Parker,* 257 N.C. 440, 125 S.E. 2d 916 (1962). A commercial transaction which involves chattel paper is often structured in such a manner that its essential character is masked. The courts of this state regard the substance of a transaction, rather than its outward appearance, as controlling. *Thompson v. Soles,* 299 N.C. 484, 263 S.E. 2d 599 (1980). Specifically, when there is an allegation that the usury laws have been violated by a particular act or course of conduct, the courts of North Carolina will not hesitate to look beneath the formality of the activity to determine whether such an incident is, in fact, usurious. *Kessing v. National Mortgage Corp., supra; Sherrill v. Hood,* 208 N.C. 472, 181 S.E.

330 (1935); *Ripple v. Mortgage and Acceptance Corp.*, 193 N.C. 422, 137 S.E. 156 (1927).

When it is broken down into its component parts, the course of dealing between the parties to the present litigation was not complicated. Under the terms of his franchise, defendant was entitled to make wholesale purchases from plaintiff on open credit accounts. The accounts could be collected on ten days notice to defendant. At all times, defendant had the option of paying for the amount due either in cash or by transferring to plaintiff the chattel paper which had been generated by the sale of the merchandise which he had received. Though, in effect, defendant had assigned the installments which were due to plaintiff, he remained liable for collecting the amounts due from the individual installment debtors and forwarding the collections to plaintiff. Whether or not the individuals made the appropriate payments to defendant, he remained obligated to pay the installments as they became due. In the event that a particular account became more than ninety days in arrears, defendant was required to repurchase the chattel paper from plaintiff even though the payments on the account might have been current.

The trial court concluded that the transactions outlined above did not amount to a loan or a forbearance; that if defendant owed any amount to plaintiff, it was in excess of $300,000 and not subject to the usury laws; that defendant was not obligated to make any interest payments; that plaintiff did not intend to reserve for itself any interest in the transactions; and that the time-price doctrine served to remove the parties' course of conduct from the purview of the usury laws. The Court of Appeals disagreed, and it concluded that the substance of the transactions between the parties involved the payment of interest in return for the forbearance in the collection of money owed on account.

## II.

Throughout the relationship between the parties, plaintiff regularly extended credit to defendant for purchases by him of merchandise. Under the terms of the purchase agreement, plaintiff agreed to accept as payment for merchandise it had sold to defendant, in lieu of cash, chattel paper owned by defendant and generated in the prosecution of his business, provided that the chattel paper was delivered to the company; that no payment on

the chattel paper was then past due; and that the assignment was properly executed. At all times, defendant remained obligated to collect, at his own expense, the payments which became due on the accounts so submitted. In the event that defendant failed to collect such payments from the debtors, he remained obligated to pay the amount then due to plaintiff. If any account became more than ninety days in arrears or if the merchandise to which the chattel paper related was repossessed, defendant was required by the terms of the purchase agreement to "repurchase" the chattel paper in question.

A loan is a delivery or transfer of a sum of money to another under a contract to return at some future time an equivalent amount with or without an additional sum being agreed upon for its use. *E.g., Boerner v. Colwell Co.,* 21 Cal. 3d 37, 577 P. 2d 200, 145 Cal. Rptr. 380 (1978). At no time did plaintiff make any sum of money available to defendant's use. That being the case, if the series of transactions involved in the case *sub judice* are to come within the scope of the usury statutes, it must be demonstrated that in some manner there has been a forbearance in the payment of money.

[2] For the purpose of applying the law of usury to a given transaction in order to determine its applicability, the term "forbearance" means the contractual obligation of a lender or creditor to refrain for a given period of time from requiring the borrower or debtor to repay the loan or debt which is then due and payable. *E.g., State ex rel. Turner v. Younker Brothers, Inc.,* 210 N.W. 2d 550 (Iowa 1973); *Cecil v. Allied Stores Corp.,* 162 Mont. 491, 513 P. 2d 704 (1973); *Carper v. Kanawha Banking & Trust Co.,* 207 S.E. 2d 897 (West Va. 1974); *compare Boerner v. Colwell Co.,* 21 Cal. 3d at 44, 577 P. 2d at 204, 145 Cal. Rptr. at 384.

[4] The essence of plaintiff's theory of the case *sub judice* as it relates to the concept of forbearance is that during the course of the series of transactions in question, defendant did not owe any debt to it the collection of which was forborne. In support of its argument, plaintiff has directed this court to three primary considerations. First, according to stipulation of fact number 10, "Vick satisfied the charges made to his regular account, and in some instances the charges made to . . . (his other accounts). . . ,

by either sending to Western Auto cash payments or by submitting to Western Auto chattel paper." Second, the chattel paper transferred to plaintiff had an inherent cash value which was equivalent to the amount of credit which defendant had received. Third, after there had been a transfer of chattel paper to plaintiff, both parties regarded the series of transactions as being the purchase and sale of goods, and the purchase and sale of chattel paper. We find plaintiff's position to be untenable.

Throughout the course of his business relationship with plaintiff, defendant had two options which were open to him regarding debts he had incurred with the firm regarding merchandise he had ordered for display and sale in his Rocky Mount place of business. While defendant could have extinguished the amount due on account by the payment of cash at all times, he had an alternative course of conduct available to him. Subject to certain conditions, defendant was entitled to transfer to plaintiff chattel paper which had been generated in the prosecution of his business in lieu of cash payment. Such a transfer would be in connection with a pre-existing debt that defendant had incurred regarding merchandise he had ordered from plaintiff. While plaintiff has argued to this court that such a transfer extinguished the pre-existing debt on the various accounts, such an argument ignores the uncontroverted fact that the transfer of the chattel paper was not absolute because the nature of the transfer imposed upon defendant a continuing personal obligation in regard to the collection and payment of amounts due under the paper. It is in this regard that we find the requirement of forbearance of a debt which is due and payable.

Some of defendant's duties in regard to the chattel paper which had been transferred were clerical in nature and required no incurrence of personal liability. It will be recalled that defendant was required to submit any such chattel paper accompanied by appropriately documented and prepared letters of transmittal. Furthermore, defendant was required to collect the payments due on the chattel paper from the debtors with whom he had contracted. These particular activities are insignificant when they are viewed in light of the context of the continuing obligation which defendant bore in relation to the chattel paper in question. It cannot be argued, nor can it be concluded, that the transfer of the chattel paper was absolute. It was only upon a complete

payout of the amount due under a particular agreement that defendant's duty in regard to that agreement was extinguished. Until that time, plaintiff had full recourse against defendant. In the event that a debtor missed a payment for whatever reason, defendant was obligated to make the payment on the debtor's behalf. If any account became more than ninety days past due, defendant had the absolute obligation to take back the chattel paper representing that account and pay to plaintiff the amount due on the account. This obligation was imposed even though defendant had made the appropriate payments himself as they had fallen due. In addition, if merchandise which had been sold under the terms of the chattel paper was repossessed by defendant, plaintiff required him to repurchase the specific chattel paper which related to the merchandise in question. In other words, at no time did defendant dispose of the chattel paper so transferred by making a final and irrevocable assignment of it to plaintiff. Not until such time as the account represented by the chattel paper in question was paid off would defendant be assured that he had no further obligation to plaintiff regarding that account. In the event that there was a default, defendant was personally liable for the amount then due as an individual payment or for the total amount outstanding. Even if no default ever occurred, defendant's liability remained absolute until the moment of payout. While plaintiff could have structured the arrangement in such a way that it could have taken the chattel paper as absolute payment of the amount due on defendant's accounts, the fact remains that it chose to do otherwise. To the extent that plaintiff accepted chattel paper from defendant in this manner, there was a forbearance of a debt due and payable.

[3]  While there is well-reasoned authority to the contrary in other jurisdictions, *e.g., Lake Hiwassee Development Co., Inc. v. Pioneer Bank,* 535 S.W. 2d 323 (Tenn. 1976); *A.B. Lewis Co. v. National Investment Corporation of Houston,* 421 S.W. 2d 723 (Tex. Civ. App. 1967), it has been the established law of North Carolina for over 120 years that if the purchaser of a note requires the endorsement of the seller as a guaranty of payment, as between the immediate parties thereto, the transaction is, in effect, a loan. *Associated Stores, Inc. v. Industrial Loan and Investment Co.,* 202 F. Supp. 251 (E.D. N.C. 1962), *aff'd per curiam,* 326 F. 2d 756 (4th Cir.), *cert. denied,* 379 U.S. 830 (1964); *Sedbury v. Duffy,* 158 N.C.

432, 74 S.E. 355 (1912); *Bynum v. Rogers*, 49 N.C. 399 (1857); *Ballinger v. Edwards*, 39 N.C. 449 (1847); *McElwee v. Collins*, 20 N.C. 350 (1839). It is our conclusion that this line of authority remains viable and serves to control the case at bar.

Though it is at most only persuasive authority and is not binding upon this court, we find Judge Craven's opinion in *Associated Stores, Inc. v. Industrial Loan & Investment Co., supra,* to have been an accurate, as well as a perceptive, analysis of the law of North Carolina on this point. In *Associated Stores,* the plaintiff was engaged in the business of the installment sale of vacuum cleaners and sewing machines. On those occasions when it needed to borrow money to prosecute its business, the capital would be furnished by defendant Industrial Loan & Investment. The defendant agreed to provide the substantial sums of money required by the retailer through the device of purchasing at a discount the conditional sales contracts which had been generated by the retail sale of appliances. The discount was usually eleven percent. Although the series of transactions took the form of the purchase and sale of individual conditional sales contracts, in one or the other of the written contracts by which the transfers were effected or by endorsement of the instruments, Associated Stores guaranteed the payment of the principal amount due to Industrial. Bound as he was to apply the law of North Carolina to the case before him, *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 82 L.Ed. 1188, 58 S.Ct. 817 (1938), Judge Craven looked to the line of cases anchored by *Bynum v. Rogers, supra,* and held that the series of transactions between Associated Stores and Industrial invoked the application of the North Carolina usury laws. The underpinning of the decision of the district court was its conclusion that the transfer with recourse in all events allowed Industrial to recoup the money it had advanced to Associated Stores as well as to collect interest on the transaction.

The seminal case in North Carolina in this regard is *Bynum v. Rogers, supra.* In *Bynum,* one Murchison was obligated to raise a sum of money to meet his liabilities at a subsequent session of the county court. In order to do so, he executed a note payable to defendant Rogers who, in turn, endorsed the note over to plaintiff at a discount of six percent. Speaking for a unanimous court, Chief Justice Nash drew upon precedent to hold that the transfer

of a note which has been discounted upon an endorsement or guaranty was a transaction subject to the usury laws.

The factual pattern in *Bynum* is identical to that in *Associated Stores*. In both cases, an instrument or some other type of commercial paper was transferred to another person upon being discounted. In both instances, the transferor was not absolutely released from the obligations imposed by the instrument upon its discount and subsequent transfer. Instead, the transferor remained liable for the principal amount due under the document by way of endorsement or other guaranty. Stated differently, under the terms of these transactions there would not be a complete release of liability until the principal amount would be discharged by the obligor. The net effect of such an arrangement would be that any funds or credit which would be extended by the transferee in return for the document would be conditional in nature and depend upon the ultimate satisfaction of the underlying obligation. This is the situation which is presented by the facts of the present case.

[4] While defendant did not receive cash upon transferring the chattel paper to plaintiff, the end result was that the debts which had been incurred through the purchase of inventory were forborne by the extension of credit to defendant's account. Otherwise, defendant would have been obligated to pay the debts so guaranteed with cash within ten days of the billing date. If the merchandise secured by the chattel paper happened to be repossessed, or if an account became more than ninety days past due, defendant was obligated to make good the amount of the debt which was then outstanding. Furthermore, in the event that a particular payment on an individual account was not made, defendant was required to make the missed payment to plaintiff. Though defendant was required to collect the payments due on the accounts which had been assigned and to send out any notices of delinquency, he remained ultimately responsible for the payment of the principal amounts due under the agreement. To that extent and in that manner, plaintiff engaged in the forbearance of defendant's debt by refraining from collecting amounts due from defendant directly until such time as it became satisfied that the chattel paper transferred would not be otherwise paid off. Furthermore, it is apparent that both parties to this arrangement contemplated that defendant's obligation to repay the credit ex-

tended was absolute in the event that the chattel paper was not paid out by the consumers who had executed it.

We therefore conclude that the Court of Appeals was correct in holding that the transactions between the parties amounted to a forbearance of money upon an understanding that the credit so extended by the forbearance would be repaid.

*III.*

[5] The third element which  must be established in order to make out a case of usury is the charging of interest at an unlawful rate. According to G.S. § 24-1 (1965), the legal rate of interest at the time of the transactions between the parties was six percent per annum. However, as even a cursory examination of Chapter 24 of the General Statutes will reveal, the ceiling of six percent is by no means absolute, and it is fraught with exceptions. Throughout the time of the transactions in question between the parties,[1] G.S. § 24-1.1 (Cum. Supp. 1977), provided as follows:

> Except as otherwise provided in this chapter or other applicable law, the parties to a loan, purchase money loan, advance or forbearance may contract in writing for the payment of interest not in excess of:
>
> (1) Eight percent (8%) per annum where the principal amount is fifty thousand dollars ($50,000.00) or less and is secured by a first mortgage or first deed of trust on real property; or
>
> (2) Ten percent (10%) per annum where the principal amount is more than fifty thousand dollars ($50,-000.00) but not more than one hundred thousand dollars ($100,000.00) and is a business property loan; or
>
> (3) Nine percent (9%) per annum where the principal amount is one hundred thousand dollars ($100,000.00) or less and is not a transaction set forth in (1) or (2)

---

1. The record does not reflect the precise dates upon which the transactions occurred. However, the parties did enter into the overall transaction in 1971 and it lasted no later than late 1975.

above; provided, a minimum charge of ten dollars
($10.00) or one dollar ($1.00) per payment may be
agreed to and charged in lieu of interest; or

(4) Twelve percent (12%) per annum where the principal
amount is more than one hundred thousand dollars
($100,000.00) but not more than three hundred thou-
sand dollars ($300,000.00); or

(5) Any rate agreed upon by the parties where the prin-
cipal amount is more than three hundred thousand
dollars ($300,000.00).

As used in this section, a 'business property loan' is a loan
purchase money loan, advance or forbearance secured by real
property of the borrower which is held or acquired for sale,
lease or use in connection with the borrower's trade, business
or profession other than farming and livestock operations,
and the proceeds of which are to be used for the purpose of
either acquiring, refinancing or improving such real property
or in connection with such trade, business or profession of
the borrower. A written statement of the borrower's inten-
tion to use the loan proceeds for such purpose, signed by the
borrower and accepted in good faith by the lender, shall be
conclusive evidence of the purpose for which the loan is
made. As used in this section, interest shall not be deemed in
excess of the rates provided where interest is computed
monthly on the outstanding principal balance and is collected
not more than thirty-one days in advance of its due date.

The eight percent rate designated by subsection one cannot
apply to the facts of the present case because there is no
evidence in the record which would indicate that the forbearances
were secured by a first deed of trust upon real property. The ten
percent rate which is allowed by subsection two does not apply to
the present case because the parties have stipulated that no
transaction in which chattel paper was submitted to plaintiff in-
volved an amount equal to or greater than $50,000. It is for this
reason that the provisions of subsections four and five do not ap-
ply either. By its own terms, section three applies to the facts of
this case. Each of the transactions involved in the present case
was less than $50,000 according to the stipulation of the parties.
None of them fits within the limitations of the remaining sections.

Therefore, the pertinent limitation of interest is nine percent per annum.

The Court of Appeals was correct in viewing the transactions between the parties as separate and distinct occurrences for purpose of applying the usury laws. While it is true that the total outstanding balance was somewhat more than $50,000, it would be unreasonable to look to the total outstanding balance as being the determinative factor with respect to the application of a given statute where, as was the case between the parties, a number of distinct and temporarily removed transfers of commercial paper were involved in the process. Furthermore, while each transaction was governed by the initial purchase agreement, that agreement provided that

> The Company, subject to the terms and provisions contained herein, (i) will accept as payment, in lieu of cash, in whole or in part for merchandise which the Dealer buys from the Company, Chattel Paper owned by the Dealer if (a) the chattel paper is delivered to the Company, (b) no payment disclosed thereon as due the Dealer from the Customer is past due at the time of acceptance by the Company, (c) the assignment thereof is properly executed and (d) *the Chattel Paper is otherwise, in the sole judgment of the Company, satisfactory to the Company,* . . . .

In other words, while the initial purchase agreement served to govern the terms of any subsequent transaction involving the transfer of chattel paper, the agreement did not absolutely commit plaintiff to the acceptance of any chattel paper tendered to it by defendant. It follows, therefore, that each of the transfers which was made thereafter was made pursuant to a separate and distinct agreement of the parties. The parties have stipulated that none of the transfers involved more than $50,000. Therefore, we conclude that the nine percent per annum limitation applies to the present case.[2]

2. The parties have stipulated through the pretrial order that the precise amount of interest owed by defendant to plaintiff was to be determined at a later time. However, the parties cannot stipulate as to the rate of interest which applies. That is a question of law to be determined by the courts. To that extent, the Court of Appeals was in error to conclude that it did not need to reach the issue of which provision of Chapter 24 governed the series of transactions between the parties.

*IV.*

[6] The fourth and final element which must be established in order to make out a *prima facie* case of usury is that of a corrupt intent on the part of the party actually lending money or forbearing upon a debt. That party, in the present case, is plaintiff. It is the law of North Carolina that the corrupt intent which is required for usury is the intentional charging of a rate of interest which is greater than that which is allowed by law. *Kessing v. National Mortgage Corp.*, 278 N.C. at 530, 180 S.E. 2d at 827. Stated differently, the corrupt intention which is required by the line of authority anchored by *Kessing* is not that the offender intended to violate the usury laws. The intent which is required is merely the intention to take the interest which is called for in the loan or forbearance agreement. In the event that the agreed upon interest exceeds that allowed by law under the particular circumstances of the case, the requisite usurious intention exists.

The record in the present case establishes this intention on the part of plaintiff. The purchase agreement called for the letters of transmittal to be structured so that defendant would deduct from the total amount due under each agreement submitted for acceptance the portion of the finance charges due under the contract which were to be retained by plaintiff when the sums due under the agreement were collected and forwarded to it. The amount of the deduction so made varied depending upon the length of the contract transferred. In any event, the deduction was never less than 65% of the finance charge, nor was it ever more than 70% of the finance charge. Nothing more must be proven under the requirements of *Kessing*.

*V.*

[7] A vendor of property may establish one price for cash and another price for credit, and the mere fact that the credit price exceeds the cash price by a greater percentage than is permitted by the usury laws is a matter of concern to the parties to the transaction and not to the courts, provided that there is no evidence of bad faith. *Michigan National Bank v. Hanner*, 268 N.C. 668, 151 S.E. 2d 579 (1966); *Carolina Industrial Bank v. Merrimon*, 260 N.C. 335, 132 S.E. 2d 692 (1963). If there is a bona fide purchase of property as opposed to a subterfuge to conceal a loan at a usurious rate, then the usury laws have no application what-

soever, even though the sale is made at an exorbitant price. *Carolina Industrial Bank v. Merrimon, supra.* The reason for the recognition of the time-price doctrine is manifest: The usury laws are directed at the extraction of more than the legal rate of interest for the use of money, and a purchaser can refrain from paying the price asked by the seller if he so chooses. *Id.* The Court of Appeals rejected plaintiff's contention that the time-price doctrine should apply to the present case for two reasons: The transactions were not bona fide sales; and the transactions did not embody a price differential which was fixed at the time of the sale. We agree with both reasons.

First, as we have noted earlier, the transfers involved in the present case were not absolute. Defendant remained at all times under a continuing obligation to plaintiff to pay off the balance due on any transferred account in the event that the merchandise sold under the account was repossessed or in the event that the account became more than ninety days past due. Furthermore, it must be remembered that if an individual debtor failed to make his installment payment, defendant was required to make the appropriate payment to plaintiff. In short, the transaction never involved the release of liability until such time as the accounts accepted by plaintiff were fully paid.

Second, there is no evidence in the record that a genuine price differential was established between the parties at the time of sale. The pertinent time in this regard is that of the time of the sale at wholesale of merchandise to defendant by plaintiff. While it is true that the chattel paper was discounted upon transfer, that discount did not in any manner affect the price of the merchandise he received from plaintiff for his store. The wholesale price of the goods defendant received from plaintiff remained the same regardless of whether he paid for the goods in cash or transferred discounted chattel paper.

## VI.

In light of the foregoing, we conclude that the Court of Appeals was correct in reversing the judgment of the trial court in favor of plaintiff. Our decision makes it unnecessary for us to consider plaintiff's argument that the trial court erred in denying its motion to dismiss defendant's counterclaim.

For the reasons stated herein the decision of the Court of Appeals is affirmed. Consequently, this cause is remanded to the Court of Appeals and that court will remand the cause to the trial court for further proceedings consistent with this opinion.

Affirmed.

Justice MEYER dissenting.

I respectfully dissent from the majority for several reasons.

First, I find the majority's reliance on prior North Carolina cases to be misplaced. It is true that prior decisions of this Court, such as *Bynum v. Rogers*, 49 N.C. 399 (1857), have said that if the purchaser of a note requires the endorsement of the seller as a guaranty of payment the transaction is, between the immediate parties, in effect, a loan. But *Bynum* and its companion cases involved settings far removed, both factually and temporally, from that found in the case at bar.

The controlling precedent so heavily relied on by the majority dates from 1857. Given the fact that the character of commercial transactions, particularly inventory financing, has changed so much since that time and the fact that negotiable instrument law in this State is now governed by the Uniform Commercial Code, I believe the majority's reliance on such venerable case law is misguided. Furthermore, although the majority recognizes that Judge Craven's opinion in *Associated Stores* has no precedential value for this Court, and apart from my finding it factually distinguishable, I would emphasize that the fact that Judge Craven was *bound* to apply North Carolina law meant that he could not rule contrary to the holding in *Bynum*. We are not so bound to rely blindly on prior decisions of this Court.

The majority is correct that this Court will look beyond form to the substance of the transaction involved. Thus in *Bynum*, where the factual record showed that the note was created solely so that one Murchison could raise necessary capital, this Court found a loan. In this case a consideration of either form or substance compels me to conclude that the majority has erred.

There is evidence in the record before us to support the trial court's findings numbered 10 and 16 to the effect that when Vick

was given credit on his account with plaintiff, whether by reason of a cash payment or by transferring chattel paper, an equivalent amount of his debt to plaintiff was considered by the parties to have been paid and the parties intended and viewed the transactions between them as a purchase and sale, not as a loan or forbearance. Finding of fact number 14, to which Vick did not except, states that both parties viewed the chattel paper as having inherent cash value equal to the amount credited to Vick's account. At the time the payment or chattel paper was credited to Vick's debt to the plaintiff, that portion of the debt was canceled and could not be revived. It is true that, as to the chattel paper, Vick continued to have certain obligations, but such obligations were based on the agreement to repurchase and not on Vick's being a primary debtor. Under the written agreement between Vick and Western Auto and under the course of conduct between the parties pursuant to those agreements, the chattel paper was accepted and credited to Vick's account as final payment.

This is a critical point. In reviewing the arrangement between the two parties, the majority says that "the net effect . . . would be that any funds or credit which would be extended by the transferee in return for the document would be conditional in nature and depend upon the ultimate satisfaction of the underlying obligation." That is simply not the case. The credit entries to Vick's accounts upon his remitting chattel paper were absolute for the simple reason that he was then allowed to charge additional items to the now-cleared account. Western Auto's internal bookkeeping reflected this; Mr. Gallimore, a witness for plaintiff, testified that Vick's transmittal of sufficient chattel paper ended his obligation on his inventory account. This even the majority implicitly recognizes, because it casts defendant's obligation as being "a continuing personal obligation in regard to the collection and payment of amounts due *under the paper*," not an obligation on his inventory account.

Other elements of the majority's characterization of the matter before us are equally troublesome. Apparently the majority finds a forbearance in the fact that plaintiff "[refrained] from collecting amounts due from defendant directly until such time as it became satisfied that the chattel paper transferred would not be otherwise paid off." Actually, plaintiff had no reason to proceed against defendant directly until the defaulting obligors actually

defaulted. The risk of default in turn was assigned to the defendant by a separate and distinct contract, the repurchase agreement, because defendant was in the best position to oversee the extension of credit and collections therefrom. Finally, the defendant's obligation to repay credit extended cannot be characterized as absolute, when, as the majority says, it was "absolute *in the event*" that the consumers who executed the chattel paper in turn defaulted on their obligations.

Representative of what I feel to be the proper resolution of the issue before us is the Supreme Court of Tennessee's opinion in *Lake Hiwassee Developing Co., Inc. v. Pioneer Bank*, 535 S.W. 2d 323 (1976). There the unanimous opinion of that court characterized the single issue in the case as "whether the purchase of notes at a discount beyond the legal rate of interest, and guaranteed at face value by the indorser, constitutes a 'loan' rather than a 'sale' so as to bring the transaction within the operation of [the] usury statutes." The court answered that question in the negative.

While the entire opinion of the court in *Lake Hiwassee* is, in my view, a correct interpretation of the law, I find two points made there especially relevant to the facts of our case. First, the court carefully considered and distinguished several older Tennessee cases where it was clear that the note was made "for the purpose of being sold, to raise money, or as an artifice to evade the usury laws . . . ." Second, the court there recognized that "commercial law shows that endorsement with recourse is standard procedure" in states which have adopted the Uniform Commercial Code. I fear the majority has not sufficiently evaluated its position in light of the substantive evolution of negotiable instruments' law since 1857.

My misgivings about the majority opinion are not confined to the legal issues involved. The question before us is not just a matter of form over substance. It is a question of recognizing or not recognizing a rather commonly used business practice which, in this case, would allow a chain store operator to buy his business from the parent company when he might otherwise be unable to do so. Certainly there is in such a relationship the possibility of abuse, but Vick was free to buy his wholesale merchandise from other parties and he was free to sell his chattel paper to anyone

he chose. I must assume he chose to deal with Western Auto because he found the terms there, including the amount of the chattel paper discount, the most advantageous. Rather than serving to create, in effect, a loan, Vick's guaranty of the paper served to increase its value, to his benefit. Thus, if we say the usury laws forbid such a transaction, we must consider who will be most harmed. I submit it will not be the large wholesalers like Western Auto, because they will simply forego the requirement of guaranty and collection by the retailer and increase the discount of the paper accordingly. Rather, it will be retailers like Vick who suffer, because they will be unable to obtain the greatest value for the chattel paper they generate.

Justices EXUM and CARLTON join in this dissenting opinion.

Justice CARLTON dissenting.

I join in the dissenting opinion filed by Justice Meyer and dissent for other reasons as well.

I must also register my disagreement with section III of the majority opinion dealing with the element of usurious intent. My first objection to that section is that it is wholly unnecessary and thus dictum. The only issues presented for our review are whether the usury laws apply to *this* arrangement for sale of chattel paper or, more specifically, whether the arrangement employed by Western Auto and Vick in transferring chattel paper was a sale or a loan or forbearance, and, if the transaction constitutes a loan or forbearance, whether the time-price doctrine applies.

The issue of usurious intent is not only not before us, its consideration is premature. I find it a rather novel approach to determine that usurious intent exists before there has been any determination that the interest charged Vick was greater than the legal maximum. I would prefer that we not consider that issue unless and until it is established that the interest charged exceeds the applicable legal rate.

Furthermore, I cannot agree with the definition given usurious intent by the majority. While *Kessing* is certainly capable of the interpretation given it by the majority, I think *Kessing*, in light of the established precedent in this area, re-

quires more than just the intentional charging of interest regardless of whether the entity making the loan is aware that the rate of interest actually charged exceeds the legal maximum. I would hold that the corrupt intent required to establish usury is the intent to charge more than the law allows, *i.e.*, knowledge that the interest actually charged exceeds the legal maximum.

That *Kessing* is capable of this interpretation is, I think, obvious from the following passage:

> In an action for usury plaintiff must show (1) that there was a loan, (2) that there was an understanding that the money lent would be returned, (3) that for the loan a greater rate of interest than allowed by law was paid, and (4) that there was corrupt intent to take more than the legal rate for the use of the money. The corrupt intent required to constitute usury is simply the intentional charging of more for money lent than the law allows. Where the lender intentionally charges the borrower a greater rate of interest than the law allows and his purpose is clearly revealed on the face of the instrument, a corrupt intent to violate the usury law on the part of the lender is shown.

*Kessing v. National Mortgage Corporation,* 278 N.C. 523, 530, 180 S.E. 2d 823, 827 (1971) (citations omitted). *Kessing* states that corrupt intent can be inferred only when the first three elements — a loan, an intent to repay, and an interest rate which exceeds the legal maximum — are shown *on the face* of the debt instrument. The majority found that the first two elements were shown on the face of the debt instruments, but nowhere does the majority find or the debt instruments show a greater rate of interest than allowed by law. Therefore, I submit that under *Kessing* the majority's conclusion that usurious intent exists is erroneous.

Furthermore, an examination of our earlier cases shows that corrupt intent requires that the loaner know that the interest charged exceeds the maximum. In *Ector v. Osborne,* 179 N.C. 667, 669, 103 S.E. 388, 399 (1920), we stated, " 'The corrupt intent mentioned in the books consists in the charging or receiving the excessive interest with the knowledge that it is prohibited by law, and the purpose to violate it. Our statute makes it usury if the interest is *knowingly* charged or received at the unlawful rate.' " (Quoting *MacRackan v. Bank of Columbus,* 164 N.C. 24, 26, 80 S.E.

184, 185 (1913) (emphasis in original). We said in *Swamp Loan and Trust Company v. Yokley*, 174 N.C. 573, 576, 94 S.E. 102, 103 (1917) that: "The corrupt intent consists in knowingly 'taking, receiving, reserving or charging a greater rate of interest than 6 per centum per annum . . .'" (citations omitted).

> A profit, greater than the lawful rate of interest, intentionally exacted as a bonus for the loan of money, imposed upon the necessities of the borrower in a transaction where the treaty is for a loan and the money is to be returned in all events, is a violation of the usury laws, it matters not what form or disguise it may assume.

*Doster v. English*, 152 N.C. 339, 341, 67 S.E. 754, 755 (1910). These cases establish that the corrupt intent required to establish usury is the intentional charging of a greater interest than the law allows.

In my opinion, *Kessing* in no way departs from or alters this standard. *Kessing* states that when, on the face of a loan instrument, the rate of interest charged is greater than the legal maximum, corrupt intent is inferred. If the rate of interest charged appears on the face of the instrument and that rate exceeds the legal maximum, that knowledge is imputed to the person making the loan; we are all presumed to know what the law says. Under the above-quoted cases and under *Kessing*, I submit that the element of usurious or corrupt intent has not been shown to exist.

My next point of disagreement with the majority is its analysis of the time-price doctrine as applied to the facts of this case. The majority concludes that the time-price doctrine is inapplicable because the transfers of the chattel paper were not absolute. I find this factor irrelevant. As I understand the opinion, the majority has decided that the transactions amounted to credit sales of merchandise to Vick with his obligation to pay secured by the assignment of the chattel paper. If, as the majority has concluded, the transactions here constitute a loan or forbearance, the relevant transaction is the sale of the merchandise to Vick. No one has claimed that the chattel paper was to be paid for over a period of time. I find the majority's treatment of the chattel paper transfer transaction to be both confusing and misleading, for it attempts to apply the time-price doctrine to the chattel paper transfer, a transaction which it has declared to be a mere

security agreement for a loan. The majority seems to recognize in its next paragraph that the relevant transaction for purposes of the application of this doctrine is the sale of merchandise to Vick, and with that statement I agree. I simply wish to say that this opinion adds to the confusion in this area of the law.

In conclusion, I would note that the areas of law involved in this case—usury, the transfer of chattel paper and the time-price doctrine—are all murky areas, difficult to understand and to apply. I not only disagree with the result reached by the majority for the reasons stated by Justice Meyer and here, I am concerned that the majority opinion compounds the confusion.

Justice MEYER joins in this dissenting opinion.