NANCY E. ODELL, INDIVIDUALLY AND ON BEHALF OF THOSE SIMILARLY SITUATED, PLAINTIFF-APPELLANT v. LEGAL BUCKS, LLC, A NORTH CAROLINA LIMITED LIABILITY COMPANY, JAMES KEITH TART AND LYNN DAVIES TART, DEFENDANTS-APPELLEES

No. COA07-1094

(Filed 2 September 2008)

**1. Appeal and Error— appellate rules violations—sanctions— failure to show substantial or gross noncompliance**

The Court of Appeals denied defendants' motion for sanctions under N.C. R. App. P. 34(b) based on plaintiff's failure to comply with the Rules of Appellate Procedure, including stylistic requirements provided in N.C. R. App. P. 26(g)(1), N.C. R. App. P. 28(b), and in the appendices to the appellate rules, because the errors did not constitute substantial or gross noncompliance with the appellate rules.

**2. Gambling— litigation funding agreement—not illegal gaming contract**

A litigation funding agreement under which defendant creditor advanced money to plaintiff borrower that was to be repaid out of plaintiff's expected recovery in a pending personal injury claim was not a "bet" or a "wager" that rendered it an illegal gaming contract under N.C.G.S. § 16-1, even though defendant's return on its advance depended on the contingent event of the amount of plaintiff's recovery on her personal injury claim, because: (1) a "bet" requires the parties to the bet to take oppo-

site sides of an uncertain event, whereas both parties in the instant case desired the same outcome of the uncertain event; and (2) a "wager" requires that neither party to the wager have any interest in the contingent event at issue, and plaintiff did have such an interest based on the determination of her legal rights.

**3. Champerty and Maintenance— litigation funding agreement—repayment from personel injury claim proceeds**

A litigation funding agreement under which defendant creditor advanced money to plaintiff borrower that was to be repaid out of plaintiff's expected recovery in a pending personal injury claim was not void as constituting champerty and maintenance where: (1) the agreement gives defendants an interest in the proceeds of plaintiff's personal injury claim rather than an interest in the claim itself; (2) plaintiff has not pointed to any evidence that defendants interfered in plaintiff's personal injury claim for the purpose of stirring up strife and continuing litigation, and the agreement specifically states that defendants have no control, input, influence, right or involvement of any kind regarding any claim, right, or interest of plaintiff in the litigation; (3) plaintiff has never alleged that defendants directly attempted to influence her decisions with respect to her personal injury claim, and while the existence of defendants' lien on the proceeds of plaintiff's recovery may have influenced some of plaintiff's decisions regarding her personal injury claim, plaintiff has not demonstrated that defendants attempted to control the resolution of her claim for the purpose of stirring up strife and continuing litigation; and (4) although plaintiff notes that courts in other jurisdictions have held similar litigation financing agreements to be champertous and void, those cases do not purport to require as a prerequisite for champerty and maintenance that a litigation lender act with a purpose of stirring up strife and continuing litigation, and thus, North Carolina law appears to require a higher level of intermeddling for a lender's actions to be considered champertous.

**4. Interest— usury—litigation funding agreement—payment from personal injury recovery**

A litigation funding agreement which assigned the expected proceeds from plaintiff borrower's personal injury claim to defendant creditor as the method of repayment of funds advanced to plaintiff was usurious because: (1) the agreement constituted an "advance" within the scope of the usury statute,

N.C.G.S. § 24-1.1, when defendant investigated the merits of the plaintiff's personal injury claim, determined that the claim was meritorious and would likely yield a recovery sufficient to pay the funds advanced to plaintiff plus interest; and thus made the advance "in expectation of reimbursement"; (2) the parties to the agreement had an understanding that the principal of the advance "shall be or may be returned" even if repayment was not absolute but was contingent on plaintiff's recovery in the litigation and, depending on the amount recovered, could be as little as zero; (3) it was undisputed that the rate of interest provided for in the agreement substantially exceeded that permitted by the usury statute; and (4) defendant acted with a corrupt intent to received more in interest than the legal rate permitted for the use of the money advanced when plaintiff simply had to show that defendant intentionally charged more for money lent than the law allowed.

**5. Creditors and Debtors; Consumer Protection— litigation funding agreement—violation of Consumer Finance Act**

A litigation funding agreement violated provisions of the Consumer Finance Act set forth in N.C.G.S. § 53-166(a) where defendant creditor had not obtained the license required by that statute and contracted with plaintiff for a payment of interest that exceeded the maximum permitted by Ch. 24 of the General Statutes.

**6. Unfair Trade Practices— litigation funding agreement— usury—failure to disclose Consumer Finance Act violation—public policy**

Defendant creditor committed an unfair and deceptive trade practice as a matter of law in entering a litigation funding agreement with plaintiff where, in addition to showing that the agreement was usurious in violation of N.C.G.S. § 24-1.1, plaintiff showed that defendant's conduct had the capacity to deceived when defendant failed to disclose to plaintiff that she was executing a contract that violated the Consumer Finance Act, and that defendant's contract with plaintiff violated the paramount public policy of North Carolina to protect resident borrowers through application of the North Carolina interest laws.

Appeal by Plaintiff from order dated 25 May 2006 and from order and judgment entered 28 December 2006 by Judge Peter M. McHugh, and from final order and judgment entered 30 April 2007 by Judge

Anderson D. Cromer in Superior Court, Rockingham County. Heard in the Court of Appeals 19 February 2008.

*Baron & Berry, L.L.P., by Frederick L. Berry; Robertson Medlin & Blocker, PLLC, by John F. Bloss, for Plaintiff-Appellant.*

*Womble Carlyle Sandridge & Rice, PLLC, by Hada de Varona Haulsee, for Defendants-Appellees.*

McGEE, Judge.

The record in this case shows that Nancy E. Odell (Plaintiff) was involved in a motor-vehicle collision in June 2001. Plaintiff retained counsel and pursued a personal injury claim against the driver of the second motor vehicle. Although Plaintiff expected to recover at least thirty thousand dollars from her personal injury claim, Plaintiff was having financial difficulties and approached Legal Bucks, LLC (Defendant Legal Bucks) to obtain an advance.

Defendant Legal Bucks is a Limited Liability Company. James Keith Tart (Defendant James Tart) and Lynn Davies Tart (Defendant Lynn Tart) are member-managers of Defendant Legal Bucks (collectively, Defendants). Defendant Legal Bucks is in the business of "litigation funding." Specifically, Defendant Legal Bucks advances money to borrowers who are expecting to recover in pending tort claims, but who need money for personal expenses before their claims go to trial or settle. When a potential borrower approaches Defendant Legal Bucks to obtain an advance, Defendants James Tart and Lynn Tart investigate the borrower's legal claim to determine the merit of the borrower's claim, how much the borrower is likely to recover, and, if an advance is made, the appropriate amount of the advance. The borrower then repays Defendant Legal Bucks, with interest, out of the proceeds of his or her recovery.

After investigating Plaintiff's personal injury claim, Defendant James Tart agreed to advance Plaintiff three thousand dollars. The parties executed a "Transfer and Conveyance of Proceeds and Security Agreement" (the Agreement) on 28 March 2003. The Agreement provided, in pertinent part:

[F]or and in consideration of the sum of Three Thousand and No/100 Dollars ($3,000.00) (the "Advance") . . . Legal Bucks and Plaintiff do hereby agree as follows:

. . . .

ODELL v. LEGAL BUCKS, LLC

[192 N.C. App. 298 (2008)]

2. Plaintiff unconditionally and irrevocably transfers and conveys to Legal Bucks all of Plaintiff's control, right, title and interest in the first monies paid to Plaintiff from the Proceeds [of Plaintiff's personal injury claim] as follows:

(A) If Legal Bucks is paid *prior to* July 1, 2003: $4,200 (the amount of the Advance ($750) plus 40% of the Advance ($300));[1] and

(B) If Legal Bucks is paid *on or after* July 1, 2003: The amount from Subparagraph A ($4,200) plus $234 (7.8% of the Advance) for each month thereafter and until Legal Bucks is paid (the "monthly assignment"). The monthly assignment will occur the first day of each month, beginning July 1, 2003. Under no circumstances, however, shall the amount owed under this Subparagraph exceed three hundred twenty-five percent (325%) of the Advance ($9,750).

3. Plaintiff hereby grants to Legal Bucks a security interest in the Proceeds of the Litigation . . . in order to secure the conveyance, subject to the terms and conditions of this Agreement[.]

4. This Agreement is expressly intended to transfer, convey and relinquish control over only a specified portion of the Proceeds which may flow from and are received as a result of the Litigation, to wit: the Security Interest. This Agreement is not an assignment, nor a purchase of any right, chose in action, cause of action, or claim which Plaintiff may have or possess as against any responsible party, respondent or defendant referred to herein. No control, input, influence, right or involvement of any kind as concerns any claim, right, or interest of Plaintiff in the Litigation is contemplated by any party to this Agreement.

5. Except as expressly provided for herein, this Agreement is contingent, speculative and without recourse on the part of Legal Bucks.

6. If there is no recovery of Proceeds by Plaintiff, then Legal Bucks shall receive NOTHING. If the Proceeds do not allow for payment of the Security Interest in full, Plaintiff shall . . . satisfy

---

1. The dollar figures listed in subparagraph (2)(A) of the Agreement appear to be incorrect. The $4,200.00 figure represents the advance of $3,000.00, plus forty percent of the advance, or $1,200.00.

the Security Interest to the maximum extent possible from the Proceeds and owe nothing further . . . .

. . . .

13. In the event that Plaintiff terminates or otherwise breaches the covenants, conditions or terms of this Agreement, Plaintiff shall pay liquidated damages to Legal Bucks in the amount of three times (3x) the Security Interest[.]

Plaintiff's personal injury claim settled for $18,000.00 in May 2005. Pursuant to subparagraph (2)(B) of the Agreement, Plaintiff owed Defendant Legal Bucks $9,582.00 at the time her claim settled. Plaintiff's debt reached the contractual cap of $9,750.00 on 1 June 2005.

Rather than repay Defendant Legal Bucks out of the proceeds of her settlement, Plaintiff filed a complaint on 15 June 2005 against Defendants alleging, *inter alia*, that the Agreement: was usurious; constituted champerty and maintenance; constituted unlawful gaming; violated the Consumer Finance Act; and was an unfair and deceptive trade practice. Plaintiff's complaint also included class allegations. The Chief Justice of the North Carolina Supreme Court issued an order on 17 August 2005 designating Plaintiff's case as exceptional and assigning Judge Peter M. McHugh to preside over the case.

Defendants filed an amended answer on 31 August 2005 denying the allegations in Plaintiff's complaint. Defendants also filed a counterclaim for breach of contract and sought $29,250.00 in liquidated damages pursuant to paragraph thirteen of the Agreement.

Plaintiff filed a motion on 27 October 2005 for partial judgment on the pleadings pursuant to N.C. Gen. Stat. § 1A-1, Rule 12(c). Defendants also moved to dismiss Plaintiff's action pursuant to N.C. Gen. Stat. § 1A-1, Rule 12(b)(6). The trial court held a hearing on the parties' motions on 22 November 2005. The trial court issued an order on 25 May 2006 granting Defendant's motion with respect to Plaintiff's unlawful gaming claim and two other claims not pertinent to this appeal. The trial court denied Defendants' motion as to Plaintiff's remaining claims, and denied Plaintiff's motion in its entirety.[2]

---

2. The record indicates that the trial court issued its ruling in a 25 May 2006 email message to counsel for Plaintiff and Defendants. The trial court directed counsel for Defendants to prepare an appropriate order. Counsel for Defendants apparently prepared the order, but the order was never entered by the trial court. The parties, how-

ODELL v. LEGAL BUCKS, LLC

[192 N.C. App. 298 (2008)]

Plaintiff and Defendants filed cross-motions for summary judgment on 16 and 17 May 2006 as to Plaintiff's remaining claims for usury, violation of the Consumer Finance Act, champerty and maintenance, and unfair and deceptive trade practices. Plaintiff also filed a motion for class certification. The trial court issued an order and judgment on 28 December 2006 denying Plaintiff's motion for summary judgment in its entirety and granting Defendants' motion for summary judgment in its entirety. The trial court also stated that "[b]ecause this ruling resolves all claims raised by [Plaintiff] in favor of [Defendants] and against [Plaintiff], the Court has not addressed [Plaintiff's] Motion for Class Certification."

Defendants filed a motion for summary judgment on their counterclaim for breach of contract and liquidated damages on 6 March 2007. Plaintiff filed a motion for partial summary judgment on Defendants' counterclaim on 9 March 2007. The trial court issued a final order and judgment on 30 April 2007 granting Defendants' motion for summary judgment on their counterclaim and denying Plaintiff's motion for partial summary judgment. The trial court awarded Defendants $29,250.00 plus post-judgment interest. Plaintiff appeals.

I.

[1] Before we reach the merits of Plaintiff's appeal, we address Defendants' motion for sanctions for Plaintiff's failure to comply with the Rules of Appellate Procedure. Defendants argue that Plaintiff's brief violates a number of the stylistic requirements set out in N.C.R. App. P. 26(g)(1), N.C.R. App. P. 28(b), and in the appendices to the appellate rules. Defendants contend that these violations warrant severe sanctions, including dismissal of Plaintiff's appeal.

We have reviewed Plaintiff's brief and find that it does not contain errors that constitute substantial or gross noncompliance with the appellate rules. *See Dogwood Dev. & Mgmt. Co., LLC v. White Oak Transp. Co.*, 362 N.C. 191, 201, 657 S.E.2d 361, 367 (2008). We therefore do not impose any of the sanctions set out in N.C.R. App. P. 34(b). *Id.* We now turn to the merits of Plaintiff's appeal.

---

ever, have stipulated that the trial court's 25 May 2006 email accurately reflects its rulings on the parties' motions. Further, the trial court's 28 December 2006 order contains an acknowledgment that the trial court previously entered an order dismissing Plaintiff's claim for unlawful gaming.

## II.

**[2]** Plaintiff first argues that the trial court erred by denying Plaintiff's Rule 12(c) motion for judgment on the pleadings, and by granting Defendants' Rule 12(b)(6) motion to dismiss, with regard to Plaintiff's claim that the Agreement is void as an illegal gaming contract. "This court reviews *de novo* rulings on motions made pursuant to N.C. Gen. Stat. § 1A-1, Rule 12(b)(6) and (c)." *Toomer v. Branch Banking & Tr. Co.*, 171 N.C. App. 58, 66, 614 S.E.2d 328, 335, *disc. review denied*, 360 N.C. 78, 623 S.E.2d 263 (2005).

N.C. Gen. Stat. § 16-1, in defining illegal gaming contracts, provides:

> All wagers, bets or stakes made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty or unknown or contingent event whatever, shall be unlawful; and all contracts, judgments, conveyances and assurances for and on account of any money or property, or thing in action, so wagered, bet or staked, or to repay, or to secure any money, or property, or thing in action, lent or advanced for the purpose of such wagering, betting, or staking as aforesaid, shall be void.

N.C. Gen. Stat. § 16-1 (2007). Plaintiff argues that the Agreement is void under N.C.G.S. § 16-1 because Defendants' return on its advance depended on a contingent event; namely, the amount of Plaintiff's recovery on her personal injury claim. Defendants respond that although their return depended on a contingent event, the Agreement does not come within the prohibition in N.C.G.S. § 16-1 because it is not a wager or bet.

Our Courts have not previously defined what constitutes a "wager" or "bet" for the purposes of N.C.G.S. § 16-1. Other sources have defined these terms as follows:

> The term "bet" is defined as . . . an agreement to pay something of value upon the happening or nonhappening of a specified contingent event. Someone must take the other side of an uncertain event to give meaning to a "bet."

> "Wagers," on the other hand, have been defined as contracts in which the parties in effect stipulate that they will gain or lose upon the happening of an uncertain event, in which they have no interest except that arising from the possibility of such gain or loss.

38 Am. Jur. 2d *Gambling* § 3 (1999) (footnotes omitted). We hold that the Agreement does not fall within either of these definitions.

A "bet," as defined above, requires that the parties to the bet take opposite sides of an uncertain event. It follows that for an agreement to constitute a "bet," there must be both a winning party and a losing party. In the Agreement at issue in the current case, however, both Plaintiff and Defendants desired the same outcome of the uncertain event: that Plaintiff recover a large sum of money in her personal injury claim. All parties to the Agreement stood to gain if Plaintiff recovered an amount equal to or greater than the sum of the principal of the advance plus the accrued interest. Likewise, all parties to the Agreement stood to lose if Plaintiff recovered less than the amount she owed to Defendants. Such an agreement does not constitute a "bet" under N.C.G.S. § 16-1, notwithstanding that the parties' respective positions under the Agreement were dependent upon a contingent event.

A "wager," as defined above, requires that neither party to the wager have any interest in the contingent event at issue. It is true that Defendants had no independent interest in the outcome of Plaintiff's personal injury claim. However, it is equally clear that Plaintiff did have an independent interest in the outcome of her personal injury claim. The outcome of Plaintiff's personal injury claim would not only define Plaintiff's legal rights and obligations under the Agreement with Defendants, but would also define her legal rights with respect to the other parties to the automobile accident giving rise to her claim. Therefore, the Agreement does not constitute a "wager" under N.C.G.S. § 16-1, notwithstanding that the parties' respective positions under the Agreement were dependent upon a contingent event.

We hold that the trial court did not err by denying Plaintiff's Rule 12(c) motion for judgment on the pleadings, or by granting Defendants' Rule 12(b)(6) motion to dismiss, with regard to Plaintiff's claim that the Agreement is void as an illegal gaming contract under N.C.G.S. § 16-1. Plaintiff's assignment of error is overruled.

III.

[3] Plaintiff next argues that the trial court erred in its 28 December 2006 order by granting summary judgment for Defendants on Plaintiff's claim that the Agreement constitutes champerty and maintenance. A trial court should grant a motion for summary judgment only "if the pleadings, depositions, answers to interrogatories, and

ODELL v. LEGAL BUCKS, LLC

[192 N.C. App. 298 (2008)]

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2007). We review a trial court's grant of summary judgment *de novo*. *Falk Integrated Tech., Inc. v. Stack*, 132 N.C. App. 807, 809, 513 S.E.2d 572, 574 (1999).

Our Court has defined champerty and maintenance as follows:

> "Maintenance" [is] "an officious intermeddling in a suit, which in no way belongs to one, by maintaining or assisting either party with money or otherwise to prosecute or defend it." "Champerty" is a form of maintenance whereby a stranger makes a "bargain with a plaintiff or defendant to divide the land or other matter sued for between them if they prevail at law, whereupon the champertor is to carry on the party's suit at his own expense." . . . [A]n agreement will not be held to be within the condemnation of the principles "unless the interference is clearly officious and for the purpose of stirring up 'strife and continuing litigation.' "

*Wright v. Commercial Union Ins. Co.*, 63 N.C. App. 465, 469, 305 S.E.2d 190, 192, *disc. review denied*, 309 N.C. 634, 308 S.E.2d 719 (1983) (quoting *Smith v. Hartsell*, 150 N.C. 71, 76, 63 S.E. 172, 174 (1908) (citation omitted)). These doctrines are "intended to prevent the interference of strangers having no pretense of right to the subject of the suit, and standing in no relation of duty to the suitor." *Hartsell*, 150 N.C. at 78-79, 63 S.E. at 175 (citation omitted). The doctrines are further "intended to prevent traffic in doubtful claims, and to operate upon buyers of pretended rights, who [have] no relation to the suitor or the subject, otherwise than as purchasers of the profits of litigation." *Id.* at 79, 63 S.E. at 175 (citation omitted). Plaintiff argues that the Agreement was champertous in that Defendants have no relation to the subject matter of Plaintiff's personal injury claim or the parties thereto, other than the fact that Defendants have given Plaintiff an advance in exchange for an interest in the profits of Plaintiff's claim.

Defendants first respond that the Agreement is not champertous because it merely gives Defendants an interest in the proceeds of Plaintiff's personal injury claim, rather than an interest in the claim itself. Our Supreme Court has stated:

> There is a distinction between the assignment of a claim for personal injury and the assignment of the proceeds of such a claim.

The assignment of a claim gives the assignee control of the claim and promotes champerty. Such a contract is against public policy and void. The assignment of the proceeds of a claim does not give the assignee control of the case and there is no reason it should not be valid.

*Charlotte-Mecklenburg Hospital Auth. v. First of Ga. Ins. Co.*, 340 N.C. 88, 91, 455 S.E.2d 655, 657 (internal citation omitted), *reh'g denied*, 340 N.C. 364, 458 S.E.2d 186 (1995). The Agreement in this case specifically states that Plaintiff "transfer[ed] and convey[ed] to [Defendant Legal Bucks] all of Plaintiff's control, right, title and interest in *the first monies paid to Plaintiff from the Proceeds*" of Plaintiff's personal injury claim (emphasis added). The Agreement further provides that it "is not an assignment, nor a purchase of any right, chose in action, cause of action, or claim which Plaintiff may have or possess as against any responsible party[.]" Because the Agreement merely assigns the proceeds of Plaintiff's personal injury claim to Defendants, such assignment does not render the Agreement champertous under *Charlotte-Mecklenburg*.

While the Assignment is not champertous under the rule stated in *Charlotte-Mecklenburg*, this does not end our inquiry. *Charlotte-Mecklenburg* held that an assignment of litigation proceeds is not *per se* champertous because such an assignment alone does not give the assignee any control over the underlying litigation. However, an assignment of proceeds may still be champertous if some other aspect of the contract gives the assignee such control.

Plaintiff argues that agreements such as the one in this case give litigation lenders a champertous level of control over borrowers' lawsuits because they have a deleterious effect on borrowers' abilities to settle their underlying claims. According to Plaintiff, a rational borrower is likely to reject any settlement offer that is less than the amount of the advance and accrued interest she owes to the lender, even if the settlement offer is perfectly reasonable. This is because the borrower will be required to pay her entire recovery to the lender, and will in effect receive nothing from the settlement. Instead, Plaintiff argues, the borrower will bring her claim to trial, because she at least has a chance of securing a larger recovery if she wins at trial. If the borrower loses at trial or only secures a small recovery, she is no worse off than she would have been had she accepted the settlement offer.

Plaintiff argues that such concerns are not merely hypothetical. Plaintiff points out that Defendant James Tart testified in his deposition that Defendant Legal Bucks has agreed to reduce the amount of its lien in a number of cases in order to facilitate a settlement, because the parties to the underlying claim were otherwise unable to reach a settlement due in part to Defendant Legal Bucks' lien on the proceeds of the claim.

We share Plaintiff's concerns regarding the potential negative effects of litigation funding on a borrower's ability or willingness to settle her underlying claim, especially given our State's strong public policy in favor of encouraging settlements. *See, e.g., Menard v. Johnson*, 105 N.C. App. 70, 73, 411 S.E.2d 825, 827 (1992) (noting that "it is well settled that North Carolina public policy encourages prompt settlement of disputed claims"). Nonetheless, we hold that the Agreement in this case is not champertous under controlling North Carolina law.

As noted above, our Courts have held for at least a century that an outsider's involvement in a lawsuit does not constitute champerty or maintenance merely because the outsider provides financial assistance to a litigant and shares in the recovery. Rather, "a contract or agreement will not be held within the condemnation of the principle[s] . . . unless the interference is clearly officious and for the purpose of stirring up 'strife and continuing litigation.' " *Hartsell*, 150 N.C. at 76, 63 S.E. at 174 (citation omitted); *see, e.g., Oliver v. Bynum*, 163 N.C. App. 166, 170-71, 592 S.E.2d 707, 711 (2004) (finding no abuse of discretion in the trial court's decision to disqualify the plaintiff's counsel, where the evidence demonstrated that counsel engaged in champerty and maintenance by facilitating and helping to secure funding for the plaintiff's lawsuit against the defendant because counsel desired to ruin the defendant's career).

In this case, Plaintiff has not pointed to any evidence that Defendants interfered in Plaintiff's personal injury claim "for the purpose of stirring up 'strife and continuing litigation.' " *Hartsell*, 150 N.C. at 76, 63 S.E. at 174 (citation omitted). The Agreement between the parties specifically states that Defendants have "[n]o control, input, influence, right or involvement of any kind" regarding "any claim, right, or interest of Plaintiff in the [l]itigation[.]" Further, Plaintiff has never alleged that Defendants directly attempted to influence her decisions with respect to her personal injury claim. In fact, Plaintiff's deposition testimony demonstrates just the opposite:

[DEFENSE COUNSEL]: . . . [W]hat did [Defendant James Tart] say when you told him that you were thinking about getting another lawyer?

[PLAINTIFF]: If I'm not mistaken, he just said [to] keep in touch with him. I might be wrong.

[DEFENSE COUNSEL]: Did you ever talk to [Defendant James Tart] about the settlement offers that [the defendant in the underlying lawsuit] made[?]

[PLAINTIFF]: Not that I know of, not to my knowledge.

[DEFENSE COUNSEL]: Did anything that [Defendant James Tart] said to you influence your decisions with respect to those [settlement] offers that were made by [the defendant in the underlying lawsuit]?

[PLAINTIFF]: Not that I—no.

While the existence of Defendants' lien on the proceeds of Plaintiff's recovery may have influenced some of Plaintiff's decisions regarding her personal injury claim, Plaintiff simply has not demonstrated that Defendants attempted to control the resolution of her claim for the purpose of stirring up strife and continuing litigation.

Plaintiff correctly notes that courts in other jurisdictions have held similar litigation financing agreements to be champertous and void. *See Rancman v. Interim Settlement Funding Corp.*, 789 N.E.2d 217, 221 (Ohio 2003) (holding that "a contract making the repayment of funds advanced to a party to a pending case contingent upon the outcome of that case is void as champerty and maintenance. Such an advance constitutes champerty and maintenance because it gives a nonparty an impermissible interest in a suit, impedes the settlement of the underlying case, and promotes speculation in lawsuits."); *Johnson v. Wright*, 682 N.W.2d 671, 678 (Minn. App. 2004) (holding a litigation funding contract champertous because the lending company "effectively intermeddled and speculated in [the] appellant's litigation and its outcome. We conclude that because recovery is tied to the outcome of the litigation, the . . . agreement is champertous.")

The cases cited by Plaintiff, however, do not purport to require as a prerequisite for champerty and maintenance that a litigation lender act with a purpose of stirring up strife and continuing litigation. North Carolina law thus appears to require a higher level of intermeddling for a lender's actions to be considered champertous.

The evidence in this case does not demonstrate that Defendants interfered in Plaintiff's personal injury claim to the extent required to support a claim of champerty and maintenance. We therefore hold that the trial court did not err by granting summary judgment for Defendants on Plaintiff's claim that the Agreement constituted champerty and maintenance. Plaintiff's assignment of error is overruled.

## IV.

**[4]** Plaintiff next argues that the trial court erred in its 28 December 2006 order by granting summary judgment for Defendants on Plaintiff's claim for usury. Our Supreme Court has stated that for a plaintiff to succeed on a claim of usury, the plaintiff must demonstrate:

> [(1)] a loan or forbearance of the collection of money, [(2)] an understanding that the money owed will be paid, [(3)] payment or an agreement to pay interest at a rate greater than allowed by law, and [(4)] the lender's corrupt intent to receive more in interest than the legal rate permits for use of the money loaned.

*Swindell v. Federal National Mortgage Assn.*, 330 N.C. 153, 159, 409 S.E.2d 892, 895 (1991). N.C. Gen. Stat. § 24-1.1 (2007), entitled "Contract rates and fees," expands the types of transactions subject to usury restrictions and specifies the maximum interest rate allowed by law. This statute provides in part:

> (a) Except as otherwise provided in this Chapter or other applicable law, the parties to a loan, purchase money loan, advance, commitment for a loan or forbearance other than a credit card, open-end, or similar loan may contract in writing for the payment of interest not in excess of:
>
> > (1) Where the principal amount is twenty-five thousand dollars ($25,000) or less, the rate set under subsection (c) of this section[.]
>
> . . . .
>
> (c) On the fifteenth day of each month, the Commissioner of Banks shall announce and publish the maximum rate of interest permitted by subdivision (1) of subsection (a) of this section on that date. Such rate shall be . . . [no greater than] sixteen percent (16%)[.]

N.C. Gen. Stat. § 24-1.1(a)-(c) (2007). It is undisputed in this case that the rate of interest provided for in the Agreement substantially exceeds that permitted by N.C.G.S. § 24-1.1.

Plaintiff argues that the Agreement constitutes an "advance" that comes within the scope of N.C.G.S. § 24-1.1. According to Plaintiff, the inclusion of "advance" transactions within N.C.G.S. § 24-1.1 means that the usury prohibition applies despite the fact that Plaintiff's obligation to repay the money owed under the Agreement was contingent upon Plaintiff's recovery in her personal injury claim. Defendants disagree. According to Defendants, it does not matter whether the Agreement is styled as a "loan" or an "advance," because the second element of a usury claim makes clear that to run afoul of usury prohibitions, the borrower must be under an absolute obligation to repay the money lent or advanced.

We first consider whether element one of Plaintiff's usury claim is met in this case. While *Swindell* asks only whether there has been a "loan or forbearance," *Swindell*, 330 N.C. at 159, 409 S.E.2d at 895, it is clear that N.C.G.S. § 24-1.1 expands the types of transactions subject to its usury prohibition to include advances and other types of transactions. We must therefore determine whether the type of transaction at issue falls within the scope of N.C.G.S. § 24-1.1.

Our Courts have consistently recognized that a "loan" is a type of transaction in which the borrower has an unconditional obligation to repay the principal. *See, e.g., Auto Supply v. Vick*, 303 N.C. 30, 39, 277 S.E.2d 360, 367, *reaff'd on reh'g*, 304 N.C. 191, 283 S.E.2d 101 (1981) (defining a "loan" as "a delivery or transfer of a sum of money to another under a contract to return at some future time *an equivalent amount* with or without an additional sum being agreed upon for its use" (emphasis added)); *Kessing v. Mortgage Corp.*, 278 N.C. 523, 529, 180 S.E.2d 823, 827 (1971) (defining a "loan" as " 'a contract by which one delivers a sum of money to another and the latter agrees to return at a future time *a sum equivalent to that which he borrows*' " (emphasis added) (citation omitted)); *State ex rel. Cooper v. NCCS Loans, Inc.*, 174 N.C. App. 630, 634, 624 S.E.2d 371, 374 (2005) (defining a "loan" as " 'an agreement, express or implied, *to repay the sum lent*, with or without interest' " (emphasis added) (quoting *Kessing*, 278 N.C. at 529, 180 S.E.2d at 827 (citation omitted))).

These cases make clear that one primary characteristic of a "loan" is repayment of the principal, or its equivalent. Therefore, a transaction in which the borrower's repayment of the principal is

subject to a contingency is not considered a "loan," because the terms of the transaction do not necessarily require that the borrower "repay the sum lent," *id.* at 634, 624 S.E.2d at 374, or return "a sum equivalent to that which he borrow[ed]." *Kessing*, 278 N.C. at 529, 180 S.E.2d at 827.

While definitions of "advance" are not as common, those that are available demonstrate that an "advance," while similar to a loan, does not require unconditional repayment of the principal. Black's Law Dictionary, for example has defined "advance" as "money advanced to be repaid conditionally[.]" Black's Law Dictionary 52 (6th ed. 1990). Our Court has also defined "advance" as " '[to] furnish[] money or goods for others in expectation of reimbursement.' " *Louchheim, Eng & People v. Carson*, 35 N.C. App. 299, 304, 241 S.E.2d 401, 404 (1978) (citation omitted). While parties to an advance transaction may have an "expectation of reimbursement," this expectation does not necessarily suggest an absolute right to repayment. In the current case, for example, before Defendants decided to advance money to Plaintiff, they investigated the merits of Plaintiff's personal injury claim and determined that Plaintiff's claim was likely meritorious and would likely yield a recovery sufficient to allow Plaintiff to repay the amount advanced. Therefore, while Plaintiff's obligation to repay the principal was conditional on her recovery, Defendants certainly made the advance "in expectation of reimbursement."

In the current case, Defendants delivered three thousand dollars to Plaintiff. While the parties expected that Plaintiff would repay the entire principal and accrued interest, Plaintiff's repayment obligations were ultimately subject to a contingency; namely, whether Plaintiff's recovery on her personal injury claim was sufficient to satisfy all or part of her debt to Defendants. On these facts, we find that Defendants' contract with Plaintiff was an "advance" within the meaning of N.C.G.S. § 24-1.1. We therefore hold that the first element of Plaintiff's usury claim is met in this case.

The second element of a usury claim requires that the parties to the qualifying transaction had "an understanding that the money owed [would] be paid." *Swindell*, 330 N.C. at 159, 409 S.E.2d at 895. Plaintiff argues that the parties had such an understanding, even if Plaintiff's obligation to repay the principal was conditional.

Defendants contend that this element demonstrates that a transaction can only be considered usurious if the borrower has an unconditional obligation of repayment. Defendants correctly note that a

number of early cases from our Courts suggest that an action for usury only lies when the borrower's obligation to repay the principal is not subject to any contingency. In *Carter v. Brand*, 1 N.C. 255 (1800), for example, our Supreme Court held that the contract at issue was usurious because "[n]o part of the principal is put in hazard, but the whole is actually secured by [a lien]; nor is the agreement to pay the [interest] subject to any contingency, but is found to have been positive and absolute." *Id.* at 257. So, too, in *Riley v. Sears*, 154 N.C. 509, 70 S.E. 997 (1911), our Supreme Court cited with approval the following explanation from the New York Court of Chancery:

> "Whenever, by the agreement of the parties, a premium or profit beyond the legal rate of interest for a loan or advance of money is, either directly or indirectly, secured to the lender, it is a violation of the [usury] statute, unless the loan or advance is attended with some contingent circumstances by which the principal is put in evident hazard. A contingency merely nominal, with little or no hazard to the principal of the money loaned or advanced, can not alter the legal effect of the transaction."

*Id.* at 518, 70 S.E. at 1000-01 (quoting *Colton v. Dunham*, 2 Paige Ch. 267 (N.Y. Ch. 1830)).

We note, however, that other decisions from our Supreme Court during the same time period suggested that the second element of a usury claim did not require an absolute obligation of repayment. In *MacRackan v. Bank*, 164 N.C. 24, 80 S.E. 184 (1913), for example, our Supreme Court stated the elements of a usury claim as:

1. A loan or forbearance of money, either express or implied.

2. An understanding between the parties that the principal *shall be or may be* returned.

3. That for such loan or forbearance a greater profit than is authorized by law shall be paid or agreed to be paid.

4. That the contract is entered into with an intention to violate the law.

*Id.* at 34, 80 S.E. at 188 (emphasis added); *see also Nat'l Bank v. Wysong & Miles Co.*, 177 N.C. 380, 386, 99 S.E. 199, 202, *cert. denied*, 250 U.S. 665, 63 L.E. 1197 (1919) (stating that the second element of a usury claim requires "an understanding that the principal shall be *or may be* returned" (emphasis added)).

ODELL v. LEGAL BUCKS, LLC

[192 N.C. App. 298 (2008)]

We further note that our State's usury statute has expressly included both "loan" and "advance" transactions within its scope since the General Assembly enacted a prior version of N.C.G.S. § 24-1.1 in 1969. *See* 1969 N.C. Sess. Laws ch. 1303, § 1. We may therefore presume that the General Assembly intended for the usury prohibition in § 24-1.1 to apply to at least two distinct types of transactions. *See, e.g., Transportation Service v. County of Robeson,* 283 N.C. 494, 500, 196 S.E.2d 770, 774 (1973) (noting that "[i]n the absence of contrary indication, it is presumed that no word of any statute is a mere redundant expression. Each word is to be construed upon the supposition that the Legislature intended thereby to add something to the meaning of the statute."). Defendants' argument that a contract may only be usurious if the borrower has an absolute obligation of repayment is inconsistent with the General Assembly's inclusion of both "loan" and "advance" transactions within the scope of N.C.G.S. § 24-1.1.

In the current case, the parties agreed that Plaintiff's repayment obligation would depend on the circumstances of her recovery on her personal injury claim. If Plaintiff recovered an amount equal to or greater than the sum of the principal of the advance and the accrued interest, Plaintiff would pay the entire principal and accrued interest out of the proceeds of her recovery. If Plaintiff recovered some amount greater than zero, but less than the sum of the principal of the advance and the accrued interest, Plaintiff would pay her entire recovery to Defendants in complete satisfaction of her debt. Finally, if Plaintiff recovered nothing, Plaintiff would have no obligation to repay the principal of the advance or any accrued interest.

The terms of the Agreement demonstrate that the parties had an understanding that the principal of the advance "shall be or may be returned." *MacRackan,* 164 N.C. at 34, 80 S.E. at 188. These terms also satisfy the contemporary requirement set out in *Swindell* that the parties had "an understanding that the money owed [would] be paid." *Swindell,* 330 N.C. at 159, 409 S.E.2d at 895. There is nothing in the Agreement suggesting that Plaintiff would be excused from paying the amount she owed, whether that amount was the full sum of the principal of the advance plus accrued interest, or some lesser amount. Rather, the parties simply agreed that under certain circumstances, the "money owed" under the Agreement would be as little as zero dollars. We therefore hold that the second element of a usury claim was met in this case.

We note that Defendants have also argued that *Vick* stands for the proposition that the usury prohibition in N.C.G.S. § 24-1.1 does not apply unless the borrower's repayment obligations are absolute. Defendants' reliance on *Vick* is misplaced. In *Vick*, our Supreme Court considered a business arrangement in which a franchisor extended credit to a franchisee. The franchisee could satisfy its debt either by paying the amount due in cash, or by transferring to the franchisor chattel paper that was generated by the franchisee's sales. *Vick*, 303 N.C. at 33-34, 277 S.E.2d at 363-64. However, the franchisee remained responsible for collecting the payments due on the chattel paper and was liable to the franchisor for the balance of any delinquent accounts each month. Further, the franchisee was required to repurchase from the franchisor any chattel paper representing an account more than ninety days past due. *Id.* at 35, 277 S.E.2d at 364. The franchisor sued the franchisee for default on its obligations, and the franchisee answered that the transactions at issue were usurious. *Id.* at 35, 277 S.E.2d at 364-65.

On appeal, the question before our Supreme Court was whether the type of transaction at issue was a "forbearance" within the meaning of N.C.G.S. § 24-1.1. *Id.* at 39, 277 S.E.2d at 367. The Court held that because the franchisee's liability for the underlying debt represented by the chattel paper remained absolute until the account was fully paid off, the franchisor's acceptance of chattel paper in the interim constituted "a forbearance of a debt due and payable." *Id.* at 41, 277 S.E.2d at 368.

We find *Vick* clearly distinguishable from the current case. The issue in *Vick* was not whether the transaction in question constituted an advance, but whether it constituted a forbearance. Further, the franchisee's absolute liability for the underlying debt in *Vick* was not the component of the transaction that brought the transaction within the scope of N.C.G.S. § 24-1.1. Rather, it was the franchisor's acceptance of chattel paper in forbearance of that debt that subjected the transaction to the usury prohibition. Contrary to Defendants' contention, *Vick* did not purport, and cannot be read, to stand for a broad proposition that N.C.G.S. § 24-1.1 only applies where the borrower is under an absolute repayment obligation. Further, Defendants' interpretation of *Vick* contradicts the express inclusion of "advance" transactions within the scope of N.C.G.S. § 24-1.1, as discussed above.

We now turn to the third element of Plaintiff's usury claim. As noted above, Defendants do not dispute that the rate of interest pro-

vided for in the Agreement substantially exceeds that permitted by N.C.G.S. § 24-1.1. We therefore hold that the third element of Plaintiff's usury claim was met in this case.

Finally, we must determine whether Defendants acted with a "corrupt intent to receive more in interest than the legal rate permits for use of the money loaned." *Swindell*, 330 N.C. at 159, 409 S.E.2d at 895. To satisfy this element, Plaintiff is not required to show that Defendant "had the specific 'corrupt intent' to enter into a usurious loan agreement." *NCCS Loans*, 174 N.C. App. at 639, 624 S.E.2d at 377. Rather, Plaintiff simply must show that Defendant "intentional[ly] charg[ed] . . . more for money lent than the law allows." *Id. See also Wysong & Miles*, 177 N.C. at 386, 99 S.E. at 202-03 (stating that "[t]he fourth element [of a usury claim] may be implied if all the others are expressed upon the face of the contract"). As discussed above, we have found that Defendants intentionally entered into a contract to receive a greater amount of interest than that allowed by N.C.G.S. § 24-1.1. We therefore hold that Plaintiff has satisfied all four elements of a usury claim. We further hold that the trial court erred by granting summary judgment for Defendants on Plaintiff's usury claim.

V.

**[5]** Plaintiff next argues that the trial court erred in its 28 December 2006 order by granting summary judgment for Defendants on Plaintiff's claim that Defendants violated the Consumer Finance Act.

The Consumer Finance Act provides in part:

No person shall engage in the business of lending in amounts of ten thousand dollars ($10,000) or less and contract for, exact, or receive, directly or indirectly, on or in connection with any such loan, any charges whether for interest, compensation, consideration, or expense, or any other purpose whatsoever, which in the aggregate are greater than permitted by Chapter 24 of the General Statutes . . . without first having obtained a license from the Commissioner [of Banks].

N.C. Gen. Stat. § 53-166(a) (2007). Our Court has previously noted that "for an unlicensed lender to charge a rate of interest on a small loan greater than the rates permitted is a violation both of the Consumer Finance Act, and of Chapter 24's prohibitions on usury." *NCCS Loans*, 174 N.C. App. at 634, 624 S.E.2d at 374.

It is undisputed in this case that Defendants have not obtained the license required by N.C.G.S. § 53-166(a). Further, as we concluded in Part IV above, Defendants contracted with Plaintiff for a payment of interest that exceeded the maximum amount permitted by Chapter 24 of the General Statutes. We therefore find that Defendants violated the Consumer Finance Act, and we hold that the trial court erred by granting summary judgment for Defendants on Plaintiff's claim for violation of the Consumer Finance Act.

## VI.

**[6]** Plaintiff next argues that the trial court erred in its 28 December 2006 order by granting summary judgment for Defendants on Plaintiff's claim that Defendants committed unfair and deceptive trade practices.

To establish a claim for unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1.1, a plaintiff must show that: "(1) [the] defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001).

Plaintiff first argues that she may succeed on a claim for unfair and deceptive trade practices merely by establishing a violation of N.C. Gen. Stat. § 24-1.1. We disagree. The General Assembly has specifically provided that certain violations of Chapter 24 are both usurious and unfair and deceptive acts. *See* N.C. Gen. Stat. § 24-1.1E(d) (2007) (providing that "the making of a high-cost home loan which violates . . . this section is hereby declared usurious in violation of the provisions of this Chapter and unlawful as an unfair or deceptive act or practice in or affecting commerce in violation of the provisions of G.S. 75-1.1"). The fact that the General Assembly has not included a similar provision in N.C.G.S. § 24-1.1 leads us to conclude that the General Assembly did not intend for violations of N.C.G.S. § 24-1.1 to be *per se* violations of N.C.G.S. § 75-1.1.

Plaintiff may still succeed on her claim, however, if she demonstrates that Defendants committed unfair and deceptive acts in addition to violating N.C.G.S. § 24-1.1. Plaintiff argues that Defendants committed such acts by failing to inform her that she was entering into an unlawful contract, and by violating established public policies supporting N.C.G.S. § 24-1.1. Defendants respond that even if their contract with Plaintiff was usurious, they did not engage in any

**ODELL v. LEGAL BUCKS, LLC**

[192 N.C. App. 298 (2008)]

deceptive conduct because they accurately disclosed the terms of the transaction to Plaintiff before she signed the agreement.

In *NCCS Loans*, the defendants engaged in "payday lending" practices in which the defendants made immediate cash advances to customers who signed contracts for Internet service. *NCCS Loans*, 174 N.C. App. at 635-36, 624 S.E.2d at 375. The defendants then charged high interest rates on the underlying cash advance. *Id.* at 635-37, 624 S.E.2d at 375-76. Our Court held that the defendants' payday lending practices were usurious and also violated the Consumer Finance Act. *Id.* at 640, 624 S.E.2d at 378. The Attorney General further argued that the defendants' practices were unfair and deceptive, and our Court agreed:

> [The] [d]efendants herein assert that, if one assumes that their customers knew they were executing contracts for a loan . . . , then [the] defendants' conduct was not "deceptive." However, "[p]roof of actual deception is not necessary; it is enough that the statements had the capacity to deceive." We observe that [the] defendants did not inform consumers that they were executing documents in violation of North Carolina's Consumer Finance Act. On all the facts of this case, we conclude that [the] defendants' contracts "had the capacity to deceive."

> Moreover, "violations of statutes designed to protect the consuming public and violations of established public policy may constitute unfair and deceptive trade practices." In this regard, we note that it is a "paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws." N.C. Gen. Stat. § 24-2.1 (2003). [The] [d]efendants' practice of offering usurious loans was a clear violation of this policy.

*Id.* at 640-41, 624 S.E.2d at 378 (quoting *Pinehurst, Inc. v. O'Leary Bros. Realty*, 79 N.C. App. 51, 59, 338 S.E.2d 918, 923, *disc. review denied*, 316 N.C. 378, 342 S.E.2d 896 (1986); *Stanley v. Moore*, 339 N.C. 717, 723, 454 S.E.2d 225, 228 (1995)). Our Court therefore concluded that the trial court did not err by ruling that the defendants committed unfair and deceptive trade practices as a matter of law, in violation of N.C.G.S. § 75-1.1. *Id.* at 641, 624 S.E.2d at 378.

Similar circumstances exist in the current case. Although Defendants disclosed the terms of the advance to Plaintiff, Defendants did not inform Plaintiff that she was executing a contract that vio-

lated the Consumer Finance Act. Therefore, Defendants' conduct "had the capacity to deceive," as Defendants did not disclose the actual nature of the transaction to Plaintiff. Further, Defendants' contract with Plaintiff for an illegal advance violated "the paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws." N.C. Gen. Stat. § 24-2.1(g) (2007). On these facts, we hold that Defendants committed unfair and deceptive trade practices as a matter of law. The trial court therefore erred by granting summary judgment in favor of Defendants on Plaintiff's claim for unfair and deceptive trade practices.

In sum, we affirm the trial court's 25 May 2006 order dismissing Plaintiff's claim for illegal gaming. We affirm the portion of the trial court's 28 December 2006 order granting summary judgment for Defendants on Plaintiff's claim of champerty and maintenance. We reverse the portion of the trial court's 28 December 2006 order granting summary judgment in favor of Defendants on Plaintiff's claims for usury, violation of the Consumer Finance Act, and unfair and deceptive trade practices. Because we find the Agreement to be invalid and unenforceable, we likewise reverse the trial court's 30 April 2007 order granting summary judgment in favor of Defendants on Defendants' counterclaim for breach of contract and liquidated damages. We remand to the trial court for further proceedings as may be necessary, including entry of judgment for Plaintiff and consideration of Plaintiff's outstanding motion for class certification.

VII.

Finally, Plaintiff argues that even should our Court find the Agreement to be valid and enforceable, the trial court erred by granting summary judgment in favor of Defendants on their counterclaim for $29,250.00 in liquidated damages. Specifically, Plaintiff argues that the liquidated damages clause in the Agreement is unenforceable as a matter of law because it did not provide a reasonable estimate of Defendants' damages in the event that Plaintiff breached the Agreement. Because we find the Agreement to be invalid and unenforceable, it is unnecessary for us to address Plaintiff's argument.

Affirmed in part; reversed and remanded in part.

Judges WYNN and CALABRIA concur.